**Lori FITZER, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**SECURITY DYNAMICS TECHNOLOGIES, INC., Charles R. Stuckey, Jr., John Adams, D. James Bidzos, Arthur W. Coviello, Jr., Marian G. O'Leary, and George Middlemas, Defendants.**

No. CIV.A.98–12496–WGY.

United States District Court, D. Massachusetts.

Sept. 28, 2000.

14

**15**

Nancy F. Gans, Moulton & Gans, LLP, Dimitry S. Herman, William H. Paine, Jeffrey B. Rudman, Hale & Dorr, Boston, MA, for defendants.

Stephen Moulton, Moulton & Gans, Boston, MA, Samuel H. Rudman, Steven G. Schulman, Michael A. Swick, Milberg, Weiss, Bershad Specthrie & Lerach, New York, NY, Randall Steinmeyer, Reinhardt & Anderson, St. Paul, MN, for plaintiff.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. INTRODUCTION

This is a putative class action alleging violations of the Securities Exchange Act of 1934 ("the Exchange Act") by Security Dynamics Technologies, Incorporated ("Security Dynamics") and six individual defendants. The plaintiff Lori Fitzer ("Fitzer"), acting on behalf of herself and all others similarly situated, alleges violations of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (Claim One)[1] and section 20(a) of the Ex-

---

**1.** Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). The corresponding regulations make it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240.10b–5 (1998).

change Act (Claim Two).[2] The action is brought on behalf of purchasers of Security Dynamics common stock during the period of September 30, 1997 through July 15, 1998 (the "class period"). Fitzer complains of a fraudulent scheme and deceptive course of business that injured purchasers of Security Dynamics stock during the class period. The defendants moved to dismiss the Amended Class Action Complaint. After an oral hearing on December 15, 1999, this Court expressed its concerns about the sufficiency of the Complaint, and instructed Fitzer to provide a Supplement to the First Amended Class Action Complaint. Fitzer later filed that Supplement (Docket 37), followed by a Second Amended Class Action Complaint (the "Amended Complaint") (Docket 40) setting out further particularization of the allegations.[3] The motion to dismiss the Amended Complaint is now before this Court.

## II. BACKGROUND

The defendant Charles R. Stuckey, Jr. ("Stuckey") was, at all relevant times, the Chairman of the Board, Chief Executive Office, and President of Security Dynamics. The defendant John Adams ("Adams") was, at all relevant times, Senior Vice President (Engineering) of Security Dynamics. The defendant D. James Bidzos ("Bidzos") was, at all relevant times, Executive Vice President and Director of Security Dynamics. The defendant Arthur W. Coviello, Jr. ("Coviello") was, at all relevant times, Executive Vice President and Chief Operating Officer of Security Dynamics. The defendant Marian G. O'Leary ("O'Leary") was, at all relevant times, Senior Vice President (Finance) and Chief Financial Officer of Security Dynamics. The defendant George Middlemas ("Middlemas") was, at all rele-

vant times, a Director of the Board of Security Dynamics.

As is appropriate at this stage of the case, the following recitation of facts is taken from the Amended Complaint.

Security Dynamics is a Massachusetts corporation with its principal office in Bedford, Massachusetts. At all relevant times, Security Dynamics was the leading provider of enterprise, network, and data security solutions. Security Dynamics was and is involved in providing products to help organizations conduct business securely, protect corporate assets, and facilitate business-to-business and business-to-consumer electronic commerce.

Its products employ a patent-protected combination of super-smart card technology, access control and privilege management products, public key encryption technology, and security administration software to protect information where it resides in an enterprise. *See* Am. Compl. ¶ 18. Security Dynamics' core product during the relevant period was the SecurID token (the "Token"), which is an authentication device slightly larger than a credit card that permits access to a corporate computer network via a user access code. *See id.* ¶ 18 n. 1. Security Dynamics markets and distributes its products mostly through a direct sales force.

In July 1996, Security Dynamics acquired RSA, a leading provider of cryptographics technology, in a stock and cash transaction valued at $200,000,000. As a result of that acquisition, Security Dynamics also acquired 4,000,000 shares of Verisign, Inc. ("Verisign"). Bidzos, the Executive Vice President and Director of Security Dynamics, was also the Chair-

---

**2.** Under section 20(a) of the Exchange Act, any person who "controls" someone who violates the Exchange Act is liable for the violation. *See* 15 U.S.C. § 78t(a). Without a primary violation of the securities law, there can be no liability under section 20(a). *See Suna v. Bailey Corp.,* 107 F.3d 64, 72 (1st Cir.1997).

**3.** This Court has granted leave to file the Second Amended Class Action Complaint, determining that it was in the interest of justice to grant Fitzer a reasonable opportunity to satisfy the high pleading burden in cases of this nature. *See* Fed.R.Civ.P. 15(a). (Docket 40.)

man and a founder of Verisign. *See* Am. Compl. ¶ 23.

In July, 1997, Security Dynamics acquired DynaSoft, a leading security company providing solutions for secure access to information, through a stock transaction involving 2,700,000 of its shares. DynaSoft's flagship data security product, called BoKS, includes technologies for access control and privilege management. *See id.* ¶ 24.

Fitzer alleges, as set out below, a pattern of misrepresentations by the officers and directors about the health and growth prospects of Security Dynamics, which misrepresentations resulted in the artificial inflation of its stock price. These misrepresentations relate to many matters, including: the decreasing demand for Security Dynamics' Token products; the difficulty of integrating the products of the acquired corporations into its own product line; the artificial inflation of sales figures by improper accounting and product delivery methods; the failure to exploit and protect the company's intellectual property; and indifference to unauthorized adverse competition from Verisign.

On April 2, 1998, Security Dynamics announced that revenues for the first quarter of 1998 would fall short of its expectations. Its stock price dropped forty percent that same day. On April 21, 1998, Security Dynamics announced that it was experiencing severe internal organizational and operational difficulties that would continue to impact earnings. After that announcement, its stock fell another twelve percent. On July 15, 1998, another announcement was made disclosing specific long-term problems in the integration of certain products. Security Dynamics' stock fell nineteen percent on the news. Fitzer claims that, in the aggregate, the value of Security Dynamics' common stock fell a total of sixty-two percent during the class period, losses she attributes to the defendants' ongoing misrepresentations about Security Dynamics' financial condition, growth projections, and future market po-

tential. Her particular allegations are set out in section IV, *infra.*

## III. STANDARDS OF REVIEW

### A. Standard of Review—Generally

In reviewing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 988 (1st Cir.1992). The Court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus.,* 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957]).

### B. Pleading Standards—Securities Action

In a securities action, two additional considerations bear upon the motion to dismiss: Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, codified at 15 U.S.C. § 78u–4 (1995). While both Rule 9(b) and the PSLRA concern the legal sufficiency of the complaint, neither affects the substantive elements of a claim that Fitzer ultimately must prove.

Rule 9(b) imposes a heightened pleading requirement on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The special pleading requirement in the fraud context has three primary purposes: "to place the defendant on notice; to safeguard defendants from unwarranted damage to their reputations; and to safeguard defendants from the danger of strike suits." *In re Lotus Dev. Corp. Sec. Litig.,* 875 F.Supp. 48, 51 (D.Mass.1995) (Saris, J.) (citing *New England Data Servs. v. Becher,* 829 F.2d 286, 289 [1st Cir.1987]). A "strike suit" refers

to a largely groundless claim brought by a plaintiff who thereafter engages in extensive discovery to increase settlement value rather than to discover relevant evidence of fraud. *See id.*

Like Rule 9(b), the PSLRA seeks to "do away with the kind of lawsuit that happens because a companies' [sic] stock drops, a suit is filed, they press discovery and they move and collect a large settlement from the company, when the suit may be baseless." 141 Cong. Rec. S19,060–02 (1995) (statement of Sen. Feinstein). Among other changes to the securities laws, the PSLRA makes the pleading standard in securities fraud cases even more rigorous than Rule 9(b) traditionally has required. Under the PSLRA, a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, in order sufficiently to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). When a complaint fails to meet the above two requirements, dismissal is required. *See* 15 U.S.C. § 78u–4(b)(3)(A).

■ Such heightened scrutiny is hardly new to this Circuit, which traditionally has set the bar for securities plaintiffs quite high under Rule 9(b). *See, e.g., Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir.1996) ("We have been especially strict in demanding adherence to Rule 9[b] in the securities context ...."); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) ("We have been especially rigorous in demanding such factual support in the securities context ...."). Pleadings based on information and belief, without specifying the source of the information and the reasons for the belief, do

not pass muster under the First Circuit's interpretation of Rule 9(b). *See Romani,* 929 F.2d at 878; *New England Data Servs.,* 829 F.2d at 288. To survive a motion to dismiss, a complaint alleging fraud must specify (1) the statements that the plaintiff contends were fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. *See Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997) (citing *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1127 [2d Cir.1994] ). The First Circuit has recently reconciled the pleading requirements of the PSLRA with its pre-existing strict standards under Rule 9(b). "The PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit. This circuit has been notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999). In *Greebel,* the court reiterated the pleading requirements:

First, this court [requires] a fraud plaintiff to specify each allegedly misleading statement or omission.

Second, this court [requires] a securities fraud plaintiff to explain why the challenged statement or omission is misleading by requiring that "the complaint ... provide some factual support for the allegations of fraud." This means that the plaintiff must not only allege the time, place, and content of the alleged misrepresentations with specificity, but also the "factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants."

Finally, this court [requires] plaintiffs who bring their claims on information and belief to "set forth the source of the information and the reasons for the belief."

*Id.* at 193–94 (citations omitted).

Furthermore, as to scienter, the courts of this Circuit already require a securities

plaintiff "to allege facts that give rise to a strong inference of fraudulent intent." *Id.* (quoting *Shields,* 25 F.3d at 1128) (citations and internal quotation marks omitted). A securities plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). Citing the *Greenstone* language, the First Circuit noted that "we do not interpret the [PSLRA] standard to differ from that which this court has historically applied." *Maldonado v. Dominguez,* 137 F.3d 1, 9 n. 5 (1st Cir.1998) (citing *Greenstone,* 975 F.2d at 22). In *Greebel,* the First Circuit confirmed that the PSLRA did not alter the pre-existing definition of scienter, and thus this Circuit continues to regard recklessness, as narrowly defined by two Seventh Circuit cases,[4] as a method of proving scienter. *See Greebel,* 194 F.3d at 199, 201.

## IV. ANALYSIS

Fitzer's claims can be separated into several types of allegations, each of which this Court will analyze in turn. Fitzer alleges misrepresentations with respect to (i) future predictions of growth and corporate health; (ii) the current demand for Security Dynamics' products and the extent of demand growth; (iii) the success of integrating the newly-acquired companies' products into its own; (iv) unauthorized competition from Verisign despite an agreement prohibiting such competition; (v) accounting manipulations achieved through the cutting of prices and the misdelivery of additional inventory; and (vi) the failure to protect patent and intellectual property interests. Fitzer points to stock sales by the individual defendants as evidence of scienter.

### A. Adverse Factors Allegedly Impacting Business

Before reviewing the alleged fraudulent misrepresentations, a review of the factors Fizter contends were impacting business is in order. These factors, if true, create the factual background against which the statements of the defendants will be viewed to detect any possible fraud.

Fitzer claims that by the beginning of the Class Period, Security Dynamics was experiencing weakening demand for its Token products. *See* Am. Compl. ¶ 34(a). In response to the decreasing demand, Security Dynamics allegedly radically reduced the price of its Token products. Security Dynamics therefore maintained its net profit only by slashing costs and increasing sales volume.

Security Dynamics also allegedly used improper revenue recognition mechanisms in order to boost the appearance of profitability and growth. *See id.* ¶ 34(b). This was achieved by the shipment of products to customers without purchase orders knowing that the products would be returned after the revenue was already recorded. Sometimes Security Dynamics left the end of the quarter "open" for several extra days to shift revenues into the reported quarter. *See* id.

Fitzer also alleges that by the beginning of the Class Period, Security Dynamics was experiencing severe and significant problems integrating its acquired companies (DynaSoft and RSA) into its product lines. Fitzer attributes these problems to the extreme technological complexity of the products and the inexperienced and inadequately trained Security Dynamics sales force. Additionally, Fitzer claims that it was clear to the defendants that the DynaSoft "BoKS" product line would not greatly contribute to Security Dynamics' financial results due to the ongoing sales

---

4. *See Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977); *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir.1977) ("We believe 'reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind.").

and marketing difficulties. *See* Am. Compl. ¶ 34(c).

Fitzer also points to increased "selling cycles," the result of Security Dynamics' customers waiting longer and longer to make purchasing decisions as they contemplated emerging and competing technology. Furthermore, Security Dynamics experienced a change in its sales channels—from direct sales to indirect sales, a realm in which Security Dynamics had few sales contacts. These changes in the sales dynamics allegedly disrupted and reduced product sales during the Class Period.

Fitzer claims that Security Dynamics also failed to exploit and protect its intellectual property. Security Dynamics allegedly failed to secure world-wide patents to protect its technology abroad and thereby faced additional competition in the European markets. Fitzer also claims that Security Dynamics' ability to enforce its patents was reduced by the dismissal of the company's patent attorneys, Wolf, Greenfield and Sacks. *See id.* ¶ 34(f).

Fitzer alleges that Security Dynamics also faced adverse unauthorized competition from Verisign, a company in which Security Dynamics had a twenty-six percent interest and which was chaired by defendant Bidzos. Verisign entered into a license agreement for RSA's encryption software engine whereby Verisign was prohibited from selling RSA's encryption protocol to original equipment manufacturers. Fitzer claims that Verisign was nonetheless aggressively selling the source code in violation of the agreement and thereby diverting sales from RSA to itself.

Fitzer also alleges various problems stemming from product obsolescence, high employee attrition, and high product failure rates for certain products. *See id.* ¶ 34(h).

All together, Fitzer paints a picture of a company with serious business integration and marketing difficulties resulting from competitive advances in technology and recent acquisitions.

## B. Basis for Knowledge

Fitzer must demonstrate that her allegations of declining demand and other management problems rest on something more than mere "information and belief." *See Lirette v. Shiva,* 27 F.Supp.2d 268, 276 (D.Mass.1998). Fitzer cannot merely speculate in hindsight that because Security Dynamics ran into a sales slowdown and reduced revenue by the end of the Class Period that statements of good corporate health made toward the beginning of the Class Period must have been inaccurate. To comply with the demanding pleading requirements of the PSLRA, Fitzer must articulate the particularized facts upon which her information and belief are formed. *See* 15 U.S.C. § 78u–4(b)(1); *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 232–33 (D.Mass.1999).

In setting out her factual allegations as to the condition of the company, Fitzer generally relies on two types of sources of information as the source material for her allegations: (1) press releases issued by Security Dynamics, its filings with the SEC, news reports, analyst reports, and other publicly available documents;[5] and (2) statements from former employees of Security Dynamics employed during the class period.

Fitzer's use of public documents, press releases, filings, and news reports is acceptable, but she cannot use simple hindsight to infer that a financial problem at Security Dynamics that began to emerge in the financial press only in April of 1998 must have been known and fraudulently concealed by the company's officers and directors during the preceding year. *See Gross,* 93 F.3d at 991 ("[W]e have consistently held that a securities plaintiff does

---

**5.** This is a general assertion repeated throughout Fitzer's Amended Complaint.

*See, e.g.,* Am. Compl. ¶¶ 15, 19–23.

not satisfy the requirements of Rule 9[b] merely by pleading 'fraud by hindsight.' "); *Greenstone*, 975 F.2d at 25. On the other hand, public documents and Security Dynamics' own disclosures, such as may be found in corrective accounting documents, may be sufficiently particularized to support the plaintiff's allegations. *See Chalverus*, 59 F.Supp.2d at 233; *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 223 (D.Mass.1999).

Although Fitzer does present documents containing allegedly fraudulent statements, she does not point to any documents that lead to the conclusion that the defendants may have been aware of a misstatement, intentional or not, about Security Dynamics' past performance. Thus, these documents are distinguishable from those in *Chalverus* and *Peritus*, in which particular transactions and accounting statements were revised and thus subject to scrutiny on their face. Fitzer's claims do not anywhere involve the *revision* of past accounting statements, but rather the alleged manipulation of the statements to shift the impact of declining sales into the future. Thus, Fitzer cannot point to particular facts and circumstances that support her allegations of fraud within the documents themselves.

Fitzer's use of former Security Dynamics employees holds more promise of establishing a particular basis for her knowledge and beliefs. These sources are all unnamed, and only a general description is given of their former position. For example, Fitzer bases her knowledge relating to diminished product demand on (1) a former employee who handled returns; (2) a former employee in the technical support department; (3) a former employee (at RSA) who was responsible for strategic planning; (4) a former employee who was a sales representative for the company's western territory; and (5) a former employee who was a sales representative. *See* Am. Compl. ¶ 34(a)(i)-(v). Other similarly described former employees provide the knowledge basis for Fitzer's other allegations.

This Court initially has concerns about the use of unnamed or anonymous sources for the basis of the plaintiff's information. Although such sources are obviously better support for Fitzer's allegations than the use of mere hindsight or speculative inference, they pose serious questions. Were such former employees in a position in the company to learn of the facts they claim to know? Are they credible or do they, as former employees, hold a grudge against the company? Ultimately, however, those are questions that go to the weight of their evidence. Fitzer has alleged in her complaint that five former employees have demonstrated to her that demand for Security Dynamics' products was in a significant slowdown by the start of the Class Period and that various manipulative practices were created to cause the demand to appear larger than it really was. These inside sources, even unnamed as they now are, do indicate to this Court that Fitzer has particularized allegations based on more than mere "information and belief."

█ The Second Circuit quite recently addressed the issue of whether, in a securities fraud case, a plaintiff must reveal the names of confidential sources in order to meet the particularity requirements of the PSLRA. *See Novak v. Kasaks*, 216 F.3d 300, 303 (2d Cir.2000). The court found no requirement in existing law that complaints in securities fraud cases must name confidential sources, nor did it see reason to impose such a requirement. The purpose of the pleading requirements is to afford defendants fair notice of the claims against them and the factual grounds upon which those claims are based. "This purpose ... can be served without requiring plaintiffs to name their confidential sources as long as they supply sufficient facts to support their allegations. Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information

to investigators in meritorious cases or invite retaliations against them." *Id.* at 314.[6] This Court is inclined to agree with the Second Circuit.

■ "Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 313. Although this Court has concluded that Fitzer is unable to rely on "other facts" (such as the documents themselves) to support her beliefs, she has described the specific employment positions her sources held. This Court believes that persons in those positions are likely to have knowledge of the facts described, including product demand and sales practices. Thus, although Fitzer does not provide the names of her sources, she satisfies the Second Circuit's analysis by providing a "sufficient general description of the personal sources of plaintiffs' beliefs." This Court therefore rules that, unless otherwise indicated *infra*, Fitzer's Amended Complaint meets the particularity requirements of Rule 9(b) and the PSLRA to the extent that her beliefs are based on unnamed but generally identified former employees who are likely to have knowledge of the facts alleged.

## C. Misrepresentations

The business difficulties alleged above are, of course, not themselves actionable. Fitzer must show that those difficulties

existed, those difficulties were material to investors, those difficulties were known by the defendants, and that the defendants knowingly made fraudulent misrepresentations in order to mislead the securities market. Fitzer outlines several ways in which she believes the defendants have committed securities fraud, each of which this Court will analyze in turn. To the extent that there are additional related allegations in the Amended Complaint not specifically quoted by this Court, they are incorporated into the analysis herein.

### 1. Expectations, Optimism, and Future Predictions

### a. The Statements

Fitzer's Amended Complaint sets out various allegations that, during the Class Period, the defendants made false statements concerning the expected health and growth of Security Dynamics. These allegedly fraudulent statements are described in the Amended Complaint as follows:

> Through the combination of SDTI [the acronym used by Fitzer to refer to Security Dynamics], RSA Data Security, Inc. and DynaSoft, the Company has consistently claimed that, "it is well positioned to take advantage of the range of opportunities in the market for enterprise network security products."

Am. Compl. ¶ 8.

> The Prospectus also described the Company [as] "well positioned" stating in pertinent part as follows:
>
> . . .
>
> *[T]he Company believes that it is well positioned to take advantage of the range of opportunities in the market*

6. The Second Circuit acknowledged that some district courts have held or implied that the PSLRA required plaintiffs to include the names of their confidential sources. *See, e.g., In re Aetna Inc. Sec. Litig.*, No. CIV. A. MDL 1219, 1999 WL 354527, at *4 (E.D.Pa. May 26, 1999); *In re Silicon Graphics Inc. Sec.* Litig., 970 F.Supp. 746, 763 (N.D.Cal.1997). The court concluded, however, that those district courts based their analysis on a misreading of the legislative history of the PSLRA and that no such requirement actually exists. *See Novak*, 216 F.3d at 313.

*for enterprise network security products.*

*Id.* ¶ 43.

On February 2, 1998, the *Wall Street Transcript Corporation* published the text of an interview with defendant Stuckey, which contained, in part, the following quotations:

. . .

The last couple of years we've been growing at a pretty healthy growth rate . . . . *The management team now has the experience to take a company from where we are to $0.50 billion to $1 billion in revenue.*

. . .

*We're a company that has a strong and experienced management team that is well positioned in dealing in this space . . . . There are very few companies that are positioned as well as us and have the track record, the experience and the management team to pull it off.*

*Id.* ¶ 51.

b. Analysis

 Fitzer claims that these statements were materially false and misleading because it was not true that Security Dynamics was "well positioned," because the Company was experiencing declining demand for Tokens, the Company was having significant problems integrating the operations of DynaSoft into its own, and RSA was experiencing competition from Verisign and high employee turnover. *See id.* ¶ 43.

Security Dynamics was arguably "well positioned" to succeed, having become the leading company in its field through its acquisitions. *See id.* ¶ 7. The fact that Security Dynamics ran into management and technology difficulties that ultimately prevented it from succeeding during the Class Period represents an unfortunate loss of opportunity, but that is precisely the risk that every investor takes when investing in a high-technology company

whose new products may not succeed. Any statements made by the defendants relating to whether Security Dynamics was "well positioned" are ultimately no more than nonactionable "puffing." *See Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir.1997) (" 'Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen.' . . . A reasonable purchaser would know that these statements consisted of optimistic predictions of future potential and would not have been misled by them.") (citation omitted); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996) (noting that "rosy affirmation[s]" made by corporate managers are non-actionable). The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects. *See In re Boston Tech., Inc.*, 8 F.Supp.2d 43, 54 (D.Mass.1998) (Lasker, J.). Thus the statements noted in the Amended Complaint and quoted *supra*, and others similar thereto, cannot act as the basis for Fitzer's claims.

2. Current and Projected Product Demand

a. The Statements

Although the general optimistic statements by management examined above cannot constitute a material fraudulent statement by themselves, if the defendants misrepresented the current extent of product demand in order to make Security Dynamics appear healthier, Fitzer's claim may have merit.

Fitzer highlights several statements relating to both the current and future demand of Security Dynamics' products:

Throughout the Class Period, the market was conditioned to believe that demand remained strong for the Company's existing Token products and that the Company was successfully develop-

ing new products which incorporated the Company's existing and acquired technologies ....

Am. Compl. ¶ 29.

Prior to and throughout the Class Period, SDTI and the Individual Defendants portrayed SDTI as a "leader" in the enterprise network and data security industry and as a company that was experiencing and would continue to experience strong and rapidly-increasing sales and profits on its core products and new product offerings.

*Id.* ¶ 30.

By the beginning of the Class Period, SDTI was experiencing weakening demand for Tokens as major customers began scaling back or canceling orders, and, as a result, SDTI was reducing prices to stimulate demand.

. . . .

Thus, during the Class Period, SDTI was only able to maintain its profit margins by slashing costs and purportedly increasing sales volume.

*Id.* ¶ 34(a).

[On September 30, 1997,] Defendant Stuckey was quoted in [a] press release in pertinent part, as follows:

> ... *The growth of the Internet and remote access continue to fuel increasing demand for the SecurID solution.*

*Id.* ¶ 35.

On October 14, 1997, in a press release issued by the Company ... Security Dynamics announced what it described as record-breaking financial results for the third quarter .... Defendant Stuckey was quoted in the press release, in pertinent part, as follows:

> *Our eleventh straight quarter of record revenues is the result of continued market demand for our en-*

*terprise network and data security solutions.*

*Id.* ¶ 36.

Fitzer also refers to the registration statement filed with the Securities and Exchange Commission incorporating the Prospectus for its new offering. *See id.* ¶ 37. According to Fitzer:

> the Registration Statement was prepared and filed on Form S–3, thereby requiring that [Security Dynamics] comply with SEC regulations for the preparation of the registration statement. In this regard, pursuant to Instruction 11(a) of Form S–3, [Security Dynamics] was required to disclose "material changes" to its business. The Prospectus failed to disclose [that] demand for Tokens was declining from historical levels ....

*Id.* ¶ 41.

b. Scienter

■■■ Before analyzing whether these statements are actionable, this Court examines who might be a proper defendant under the PSLRA's scienter standards. To comply with the pleading requirements of the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind for liability under section 10(b) and Rule 10b–5 is referred to as "scienter," which the Supreme Court found to be "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The First Circuit has recently ruled that scienter can be established by indirect and circumstantial evidence of many different kinds. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir.1999). Under the PSLRA, however, the alleged facts "must now present a strong inference of scienter." *Id.* at 197. "A mere reasonable inference is insufficient to survive a motion to dismiss." *Id.* Unnamed employees simply cannot, in the opinion of this Court, establish a strong inference of scienter

with respect to management.[7] It is certainly plausible that if five former employees of Security Dynamics knew of a serious downturn in product demand then management was also aware of the situation. But plausibility is not the standard here—Fitzer must present facts that give rise to a *strong* inference of scienter. These employees might theoretically be able to come forward with evidence of communications from them, acting in the front lines of the sales force, to the defendants, expressing their observations of a downturn. For all this Court can surmise, however, the former employees discovered by Fitzer noticed a downturn in demand and may have made adjustments to keep the sales volume higher, but those actions might have never come to the attention of the named defendants in this case. This Court cannot speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them in the October 1997 press release. This is especially the case when the identities of the former employees and the specific roles they played in the company have been withheld. Thus, Fitzer cannot use her unnamed informants to satisfy her burden to show scienter.

■ Scienter may also be strongly inferred, however, when there is unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders. *See id.* at 197; *Shaw,* 82 F.3d at 1204. Such trading must be "unusual, well beyond the normal patterns of trading by those defendants." *Greebel,* 194 F.3d at 198.

■ Fitzer provides a chart showing the stock sales activity of four named defendants: Bidzos, Stuckey, Coviello and Adams. *See* Am. Compl. ¶¶ 71–73. This chart indicates that during a one-year period prior to the Class Period, the four defendants sold a total of 362,400 shares. During the Class Period (approximately one year), they sold a total of 668,573 shares. This represents a more than 84% increase in their sales. Furthermore, each defendant made his largest sale on October 16, 1997, two days after the press release proclaiming record revenues and strong product demand (and the same day the new offering was announced). Stock sales during the Class Period amounted to fifty-four percent of Bidzos' holdings, thirty-one percent of Stuckey's holdings, twenty-seven percent of Middlemas' holdings, and over fifty percent of Coviello's holdings. The total value of these stock sales during the Class Period was $23,699,609. Furthermore, Stuckey and Bidzos both made large stock sales in July of 1997, just before the Class Period starts but at a time when they may have already known about the alleged decline in demand or other production problems at Security Dynamics. The timing and relative size of these stock sales raises a strong inference in the mind of this Court that Bidzos, Stuckey, Coviello, and Adams may have known of the discrepancy between Security Dynamics' actual financial health and the representations being made in the October press release. Thus, Fitzer's claims, if they are viable, could be sustained as to those four defendants. Fitzer has not presented information about the pre-Class Period stock trading practices of either O'Leary or Middlemas, and therefore, this Court does not find a strong inference of scienter with respect to them. Even were Fitzer's claim actionable, O'Leary and Middlemas would have this particular claim against them dismissed, in addition to any other claim that relies upon insider stock sales to establish their scienter.[8]

---

**7.** A strong inference of scienter may be established by showing unusual trading at suspicious times by insiders. *See Greebel,* 194 F.3d at 197. Merely pleading motive and opportunity is not enough. *See id.* The issue of inside trading will be examined *infra.*

**8.** These other claims are set out in detail *infra.*

Thus, unless additional evidence of scienter is presented in her other claims, Fitzer can only sustain her claims, whatever they are, against Bidzos, Stuckey, Coviello, and Adams.

### c. Analysis of the Statements

This Court now turns to the question of whether the identified statements are actionable.

■ The first three statements relating to demand level identified by Fitzer are not specific statements but rather merely provide background for Fitzer's interpretation of the events. Fitzer cannot sustain a claim based on the general assertions that Security Dynamics "conditioned" the market to believe it was healthy. Specific and fraudulent statements must be identified. The first three statements related to demand are therefore insufficient to sustain Fitzer's claim.

■ The next statement, Stuckey's press release, is another example of mere optimistic corporate puffery by a corporate executive. Indeed, the notion that the Internet is fueling increasing demand for secure transaction systems strikes this Court as being a truthful statement. Stuckey's statement offers no details on which a reasonable investor would rely, and thus, the statement is non-actionable.

■ Security Dynamics' press release of October 14, 1997, gives this Court significantly more pause. In that report, Security Dynamics reported a record sixty-five percent increase in revenue, and Stuckey represented that the revenue was the result of "continued" market demand for Security Dynamics' products. Two days after the press release, System Dynamics

announced commencement of a public offering of 3,000,000 shares of common stock. According to Fitzer, this press release was materially false and misleading because demand was in decline and Security Dynamics was employing manipulative practices to inflate its revenues artificially.

This Court, however, views Stuckey's statements as corporate puffing. *See In re Boston Tech., Inc.*, 8 F.Supp.2d 43, 54 (D.Mass.1998) (Lasker, J.) (puffing rule applies to optimism about current state of affairs). The phrase "continued market demand" is a vague, optimistic statement attributing the results to market demand. It does not specify a particular market demand, a market share figure, or represent that the market demand is static, shrinking, or growing. Instead, it says that the market continues to demand Security Dynamics' products. This general proposition was true and would not mislead a reasonable investor.[9]

Fitzer's allegation that the registration statements filed with the SEC failed to disclose material changes also requires significant analysis.[10] Although silence about changes in a corporation is generally not considered actionably misleading, the obligations that attend the preparation of public offering filings embody an affirmative duty to disclose a broad range of material information. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir.1996) (Lynch, J.). If the issuer of the stock is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information, it is consistent with the basic statutory policies,

---

9. Even if Fitzer's allegations of price cutting are true, the statement makes no representation that prices have been stable or that Security Dynamics has not done what every company does—lower its prices in order to sustain demand as technology evolves. Although Fitzer's allegations of improper sales "channel stuffing" are more worrisome than price adjustments, those allegations of chan-

nel stuffing must be dismissed from this action for lack of particularization. *See infra* section III.C.6.b.

10. The issue of how much and what Security Dynamics was obliged to disclose prior to its public offering will be revisited by the Court *infra.*

which favor disclosure, to require inclusion of that information in the registration statement. *See id.* at 1210. In *Shaw*, the First Circuit reasoned that the relationship between the nonpublic information and the actual results can be so attenuated that the undisclosed information could be considered immaterial as matter of law. Yet in the case before it, the First Circuit noted that the prospectus in question was filed eleven days prior to the end of the quarter in progress and the results of that quarter were far more than a minor business fluctuation. The First Circuit held that it could not conclude as matter of law and at the dismissal stage of the litigation, that such information was not subject to mandatory disclosure under the rubric of "material changes" in Item 11(a) of Form S–3. *See id.*

▮ Here, Fitzer has not shown with particularity the extent to which demand slowed by October 1997. Thus, this Court is unable to determine whether the failure to disclose the alleged downturn in demand would appear to investors at that time to most resemble a short-term business fluctuation or an "extreme departure" from known performance. Unlike *Shaw*, the offering in the present case came only two weeks into the fourth quarter, a quarter which turned out to be successful for Security Dynamics. Six months passed between the time the prospectus was issued and the disclosure of bad news. Although the defendants allegedly manipulated the prices of their products in order to keep sales volume high, lowering prices is an ancient and legitimate business tactic used to spur demand. Therefore, Fitzer does not state a claim with respect to the non-disclosure of "extreme" business trends. The First Circuit explicitly rejected any bright-line rule that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market. Fitzer must allege particularized facts demonstrating that there was, as early as October 1997, an "extreme departure" from the company's past performance. The Amended Complaint alleges that sales of the Token product declined and were not replaced by the anticipated new technology products. In response, Security Dynamics lowered their prices to maintain profitability—as any corporation would do when trying to keep its older products profitable while awaiting the release of the next generation of products. This Court rules that, at the time of the prospectus, Security Dynamics' failure to disclose alleged demand fluctuations was not actionable as to investment losses that only began to surface six months later. Fitzer has simply not shown that an "extreme departure" had taken place early enough to warrant disclosure on the registration statement.

Fitzer's claims with regard to System Dynamics' product demand levels thus fail to give rise to a viable claim against any of the four eligible defendants: Stuckey, Bidzos, Coviello, and Adams.

### 3. Integration of Acquired Companies

Fitzer alleges that there was great difficulty integrating the two acquired companies, DynaSoft and RSA, into Security Dynamics, that these difficulties evolved into an apparent long-term product development crisis that System Dynamics failed to disclose to the public, and that misleading statements were made about these difficulties.

#### a. The Statements

The facts and statements in question are identified by Fitzer in her Amended Complaint:

> Despite the difficulties surrounding the integration of the companies' technologies, at the time of the merger and thereafter SDTI claimed that it would "integrate the technologies, products and staff of SDTI and Dyna–Soft, rather

than operate DynaSoft as a separate division."

Am. Compl. ¶ 25.

In fact, following the announcement of the DynaSoft acquisition, SDTI published on its web site a list of frequently asked questions ("FAQs") relating to the merger. Defendants used this publication to condition the market to believe that the Company was technically well-equipped and had sufficiently trained staff and available resources to effectively integrate DynaSoft into the Company, and to effectively integrate BoKS products into SDTI's enterprise security products. At that time, defendants stated that the DynaSoft acquisition would facilitate and expedite SDTI's entrance into the ESS market.

*Id.* ¶ 26. The relevant portions of the FAQ on the website provided:

Q. How will DynaSoft staff be incorporated into SDTI?

A. ... In fact, *the acquisition of DynaSoft accelerated SDTI's efforts to deliver its Enterprise Security Services (ESS) architecture.*

Q. How does this relate to Security Dynamics' ESS strategy announcement?

A. ... *Since DynaSoft's BoKS family provides functionality in several of these areas, the acquisition will accelerate our ability to deliver ESS.*

Q. How will DynaSoft be integrated into SDTI and RSA's business?

A. In the world of ESS, SecureID and smart cards are and will be the preferred means of authentication and access control.... *What the enterprise needs is integrated support from all forms of token-based access, with tightly-integrated public-key cryptography and certificates for authorization, audit, and management, and a scalable server from which to administer and manage it all. The integration of DynaSoft technology and SDI and RSA technolo-*

*gy will position us to be the first to offer such a solution.*

*Id.*

SDTI attempted to supplement its business by acquiring DynaSoft and its BoKS product line. The BoKS product line, however, was extremely complicated and therefore both difficult to integrate into SDTI's EES framework and difficult to customize and install for customers. In addition, SDTI's sales force was woefully untrained in BoKS technology and did not understand the technology and, thus, was unable to sell it. According to numerous former employees of the Company ... the BoKS technology was extremely complex and the Company's efforts to sell that technology and integrate it into its own technologies was extremely problematic.

*Id.* ¶ 32.

In addition, contrary to defendants' representations, defendants had no workable plan to integrate the DynaSoft products into SDTI's product line. Thus, the problems related to the integration of DynaSoft into SDTI created disruption and dissension in SDTI's sales force and distracted management from the Company's core business ... unbeknownst to the investing public, SDTI embarked on an extremely reckless course of conduct whereby a single BoKS support person was to be responsible for closing all BoKS sales initiated by the untrained sales staff.

*Id.* ¶ 34(c).

These sales persons could not answer customers questions regarding BoKS products and as such, could not even initiate sales.... In addition to SDTI's inability to sell BoKS products, the Company could also not service the few BoKS products the Company did sell. ... Thus, from the start of the Class Period, it was abundantly clear to defendants that DynaSoft and the BoKS

product line would not greatly contribute to SDTI's financial results.

*Id.*

As a result of the slowing demand for RSA's products, SDTI's employees soon realized that RSA's future was not bright and that management has no plans to supplement RSA's growth. This realization caused a significant number of employees to resign from RSA .... Also, throughout 1997, significant quality issues began to surface relating to SDTI's introduction of the [Token product model] fob–620.... Finally, the Company knew, but failed to disclose, that SDTI was also experiencing significant problems and delays related to the development of SecureSite, the Company's enterprise-wide security solution. [I]nstead, SDTI publicly projected consolidated sales of the product and claimed that the product was ready to be put on the market.

*Id.* ¶ 34(h).

Fitzer also points to statements in the October 1997 Prospectus, in which Security Dynamics warned that adverse factors might impact the company when in fact Fitzer alleges those factors were already negatively impacting the company:

On July 15, 1997, the Company acquired DynaSoft, a leading provider of security solutions for protecting access to corporate information and applications. *Achieving the anticipated benefits of the Dynasoft Acquisition will depend in part upon whether the integration of DynaSoft's business is accomplished in an efficient and effective manner, and there can be no assurance that this will occur. The combination of the two companies will require, among other things, integration of the companies' respective product offerings and coordination of their sales and marketing and research and development efforts. There can be no assurance that such integration will be accomplished smoothly or successfully ... The inability of management to successfully integrate the operations of*

*the two companies could have a material adverse effect on the business and results of operations of the Company.*

....

*Additional unanticipated expenses may be incurred relating to the integration of the businesses of the Company and DynaSoft, including the integration of certain product lines and distribution and administrative functions.*

....

In February 1997, the Company announced ESS, a framework designed to deliver enterprise-wide security solutions to businesses.... There can be no assurance, however, that the certificate management, key management and privilege management technologies under consideration by the Company will be adopted by the marketplace, that the Company will find appropriate partners for developing and marketing its products or that the Company will successfully market any products developed as part of the ESS framework.

....

The Company's future success will depend in part upon its customers' and end users' demand for enterprise network and data security products and upon the Company's ability, on a timely and cost-effective basis, to enhance its existing products and to introduce new products with features that meet changing customer requirements and with competitive prices.

*Id.* ¶ 45. Fitzer alleges that these adverse factors were not prospective but were in fact already negatively impacting the Company and its operations at the time the prospectus became effective:

On January 12, 1998, the Company issued a press release published on *PR Newswire,* in which it heralded the introduction of "SecureSight," which the Company described as its new family of plug-in security solutions which, according to the Company, provide secure access to information throughout an enter-

prise. The press release stated, among other things, the following:

> The SecureSight product family is currently scheduled to roll-out through 1998 in two major releases. Version 1.0 of the SecureSight Desktop, Manager, Agents and Agent Toolkit, *with preliminary integration of the ACE and BoKS families,* is expected to be available in the second quarter of 1998.

This statement was materially false and misleading because given the complexities of the BoKS technologies and the Company's problems with the products, defendants lacked a reasonable basis to state that the SecureSight product was expected to be available in the second quarter of 1998.

*Id.* ¶ 48.

### b. Analysis

Fitzer's knowledge and belief of these facts comes from discussions with nine unnamed former employees of System Dynamics and DynaSoft, including people in management, business planning, sales, and BoKS project management. As analyzed *supra,* information gathered through discussions with unnamed employees who were in a position to know these things, and whose positions are identified, satisfies Fitzer's burden of pleading with specificity under Rule 9(b) and the PSLRA. A close look at the identified statements reveals, however, that they are not actionable.

The first statements identified by Fitzer consist of loosely optimistic descriptions of Security Dynamics' plans for the integration of DynaSoft. *See id.* ¶¶ 25–26. They take no position on the present condition of that integration. It was not inaccurate for Security Dynamics to represent that it planned to integrate the acquired companies' product lines, even if that integration met with initial difficulties. These statements could only be viewed as false if, at the time they were made, Security Dynamics had totally abandoned the idea of integrating the companies and had a dif-

ferent plan in mind. These statements would not have been relied on by investors to determine the progress of the integration, but rather only to determine Security Dynamics' intentions, which were precisely those expressed by the statements.

The Security Dynamics' Frequently Asked Questions list on its website presents a more affirmative statement of the integration prospects. *See id.* ¶ 26. These statements indicate that the integration "accelerated" Security Dynamics' efforts and abilities, and that the result would be a "preferred" product and would "position [Security Dynamics] to be the first to offer such a solution." *Id.* These statements are no more than corporate "puffery" that cannot be said to have misled investors. As this Court ruled in *In re Peritus Software Servs., Inc. Securities Litigation,* 52 F.Supp.2d 211 (D.Mass. 1999), optimistic statements relating to the success of a merger that include language such as "the acquisition . . . has been a success," "this confirms our belief that clients can easily leverage the combined product suites," and "[we have] completed the . . . acquisition" are non-actionable. The plaintiffs in *Peritus* had alleged that the merger was actually far from successful because the companies' products did not fit well together and the sales force experienced internal friction that resulted in employee attrition and a stoppage of sales. *See id.* at 226; *see also Grossman v. Novell, Inc.,* 120 F.3d 1112, 1121–22 (10th Cir.1997) (statements relating to a merger that included the language "substantial success," "compelling set of opportunities," "moving faster than we thought," and "expanding scope of network solutions" were puffing statements incapable of objective verification). *Peritus* and the Tenth Circuit's *Grossman* case are particularly instructive here. Security Dynamics, in its FAQ, has stated even less than the defendants in those cases. No representations were made that the merger was a success or that consumers were responding to the combined products. Thus, Secu-

rity Dynamics' statements are even less misleading than those this Court examined in *Peritus,* and therefore quite clearly non-actionable.

The next set of allegations by Fitzer consists of management problems that are not, on their own, actionable as fraud. *See* Am. Compl. ¶¶ 32, 34(c), 34(h). These include allegations of disruption and dissension in the sales force, the selection of only one person to be responsible for closing all the BoKS sales, and inexperienced and poorly-trained sales and service personnel. Although these allegations, if true, certainly could disappoint an investor who may have believed that Security Dynamics could have succeeded, poor management is a risk that every investor takes. Damages flowing therefrom are not actionable under the securities laws.

Finally, Fitzer directs this Court to the statements made in the October 1997 prospectus. *See id.* ¶ 45. An examination of those statements reveals, however, that they are forward-looking statements accompanied by effective cautionary language and therefore non-actionable. The "bespeaks caution" doctrine stands for the principle that when statements such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, these so-called "soft" statements may not be materially misleading under the securities laws. *See Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996); *In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F.Supp.2d 1, 19 (D.Mass.1999). The Security Dynamics prospectus is replete with cautionary language concerning the prospects of the company, and in particular warns that the inability of management to successfully integrate the operations of the two companies could have a material adverse effect on results. *See* Am. Compl. ¶ 45. Such cautionary language is sufficient to warn the investing public about the uncertainties of the inte-

gration effort, particularly in an industry as rapidly changing and complex as computer security systems. Here, the prospectus made no actual representation as to when the integration would be complete, making the statement even less of a concern than the one in *Number Nine.* In a January 1998 press release, Security Dynamics did represent, however, that it expected integration of the ACE and BoKS families to occur by the second quarter of 1998. This Court, however, has previously held that statements concerning the planned release date for a complex technical product are non-actionable when accompanied by cautionary language. *See In Re Number Nine,* 51 F.Supp.2d at 19. The January 12, 1998 press release contains a cautionary statement related to factors that could cause the release date to vary, including delays in product development, undetected software bugs, competitive pressure, and market acceptance. *See* App. in Supp. of Def. Mot. Tab at 7 Bates Nos. 116–18. Thus, the statements in that Press Release are non-actionable.

Overall, none of the statements that Fitzer has identified with respect to the integration of the acquired companies and their products is actionable.

### 4. Unauthorized Competition from Verisign

#### a. The Statements

Fitzer alleges that Security Dynamics failed to disclose the fact that Verisign was engaged in competition in violation of its licensing agreement. In particular, she alleges:

RSA was experiencing intense competition from Verisign, a company that was partially-owned by SDTI through RSA and of which defendant Bidzos was Chairman. As detailed in ¶ 34(h) below, Verisign violated the terms of a licensing agreement with RSA by selling RSA's source code to Original Equipment manufacturers (OEMs) and directly competing with RSA. As a result, RSA was

experiencing declining sales [and] an extremely high rate of employee attrition. Am. Compl. ¶ 33.

The Verisign Agreement specifically prohibited Verisign from selling RSA's encryption protocol to Original Equipment Manufacturers—which would have put it in direct competition with RSA.... Verisign was not permitted to "in any way sell, rent, license, sub-license, or otherwise distribute the RSA software or any part thereof or the right to use the RSA software or any part thereof as a stand-alone product to any person or entity." Verisign, however, in contravention of the Verisign Agreement, was aggressively selling the source-code to OEMs and thus diverting sales from RSA to Verisign.... Prior to and throughout the Class Period, there were numerous meetings between and among defendants Stuckey, Bidzos and senior executives of RSA at which Verisign's violation of the agreement was discussed.

Id. ¶ 34(g).

The Prospectus described the Company's relationship with Verisign, as follows:

On April 17, 1995, and February 20, 1996, the Company purchased 425,000 shares of Series A and 72,091 shares of Series B Convertible Preferred Stock, respectively of Verisign, Inc. ("Verisign") of Redwood, California for an aggregate purchase price of $687,000. Verisign was organized to provide digital certificated and related services that use public-key cryptography to ensure essential privacy and authentication features. During 1995, RSA granted certain rights and privileges in certain technology to Verisign in connection with Verisign's incorporation and received 4,000,000 shares of Verisign common stock.

This statement was materially false and misleading because it failed to disclose that Verisign was breaching its agreement with the Company and directly competing against it by selling RSA source code to OEMs.

Id. ¶ 38.

A section in the Prospectus entitled "Competition" stated:

The Company currently experiences competition from a number of sources, including (i) software operating systems suppliers and application software vendors that incorporate single-factor statice password security system into their products; (ii) token-based password generator vendors promoting challenge/response technology; (iii) smart card security device vendors; (iv) biometric security device vendors; (v) public key infrastructure and cryptographic software firms and (vi) SSO providers.

This statement was materially false and misleading because it failed to disclose that the Company was experiencing direct competition from Verisign ....

Id. ¶ 39.

With respect to the Verisign Agreement, the Prospectus described RSA's obligations but omitted to disclose Verisign's agreement and its breach thereof stating:

RSA has agreed, in connection with the April 1995 formation of Verisign, not to engage, directly or indirectly, in the business of issuing public key certificates acting in the capacity of a certificate of authority for a period of five years from the date of such formation.

This statement was materially false and misleading because it failed to disclose that Verisign was breaching the terms of the Verisign Agreement and directly competing with SDTI ....

Id. ¶ 40. Fitzer also alleges that Security Dynamics failed to disclose the breach in its Form S–3 and 10–K filings. See id. ¶¶ 41(c), 54.

#### b. Analysis

■ A corporation should not be required to disclose its prospective litigation position with respect to outstanding contractual and license relationships. Perhaps management decided that maintaining the relationship with Verisign, even in the face of unauthorized competition, was the best course of action.[11] Fitzer herself alleges that the officers were aware of the problem and discussed it. Regardless of the wisdom of their decision, Fitzer cannot successfully argue that poor management is a proxy for fraud, or that the defendants were required to disclose their position with respect to the alleged license violation. This Court will not sit in judgment of such business decisions. To the extent that Fitzer's allegations are that Bidzos channeled sales to Verisign due to his own financial interests, the claim is one of director malfeasance—violation of the duties of care and loyalty—which is not before this Court. A claim of fraud cannot arise from poor management or, likewise, from failure to disclose a prospective litigation position. *See generally Santa Fe Indus. Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Serabian v. Amoskeag Bank Shares,* 24 F.3d 357, 361 (1st Cir.1994); *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 212 (D.Mass.1993) (poor management or even gross mismanagement are not actionable under securities laws). The company may wish to keep confidential its position on such matters, and it may do so.

#### 5. Failure to Protect Intellectual Property

■ Fitzer's Amended Complaint contains several allegations related to Security Dynamics' alleged failure to protect the value of its intellectual property. In particular, she alleges that management knew or recklessly disregarded but failed to disclose that the Company had recklessly failed to secure worldwide patents to protect its proprietary technologies. *See* Am. Compl. ¶ 34(f). Security Dynamics thus faced additional competition in the European markets and elsewhere. Fitzer also suggests that Security Dynamics' ability to enforce its patents was reduced by the dismissal of the company's patent attorneys. The Prospectus claims that the company's success and ability to compete "is dependent in part upon its proprietary technology. The Company relies on a combination of patent, trade secret, copyright and trademark laws, software licenses, nondisclosure agreements and technical measures to establish and protect its proprietary technology." *Id.* ¶ 44.

At most, these allegations sound in mismanagement, not fraud. Fitzer's analysis would sweep too broadly, by turning every corporate missed opportunity, if not disclosed, into a potential securities fraud claim. The statements in the prospectus state the general and obvious situation: Security Dynamics relies on intellectual property law to protect its proprietary technology. Security Dynamics, however, did not represent that it had acquired protection outside the United States. Perhaps the officers had decided that those markets were unprofitable—a business decision. Indeed, the Prospectus discloses that "laws of certain countries in which the Company's products are or may be developed or sold may not protect the Company's products and intellectual property rights to the same extent as the United States." *See* Def.'s Mem. at 15. Fitzer may regret that Security Dynamics was not a more aggressive player in the worldwide market, but that is a flaw in the company's management position, not a ba-

---

**11.** This is especially plausible given the fact that Security Dynamics owned a 26% interest in Verisign and thus had an interest in avoiding litigation that would incur legal fees and expenses for both companies. Furthermore, the disclosure of an alleged violation of the agreement might have created ill will between the companies, causing an even greater disruption to the sales stream, that had a consequent effect on revenues.

sis for a securities fraud action.[12]

### 6. Manipulative Sales and Accounting Practices

Fitzer alleges a pattern of improper revenue recognition and manipulative sales practices that Security Dynamics used to artificially inflate reported sales.

#### a. The Statements

[D]efendants embarked on a scheme to artificially inflate SDTI's sales figures by engaging in a host of fraudulent activities. Most notable was the defendants' scheme to ship products to customers without purchase orders or in violation of the terms of valid purchase orders, in an effort to artificially inflate reported sales. In this regard, defendants regularly forced shipments of products to customers knowing that such products would be returned. As an example of such behavior, when large accounts would place a year-long order for products that were supposed to be shipped on a monthly basis, at the end of a quarter SDTI would regularly ship the remaining yearly balance—*these quarterly over-shipments often reached 5,000 cards.* As a further example of this type of behavior, SDTI would also regularly ship non-complying products to customers.... *During the Class Period, it is estimated that approximately 5,000 to 10,000 cards valued at approximately $45 per card were shipped in these fraudulent manners each quarter.* Additionally[,] defendants regularly left the end of the quarter "open" for several additional days in an effort to improperly shift and report additional revenues within the quarter.

*Id.* ¶ 34(b). Fitzer bases this knowledge on discussions with four unnamed former Security Dynamics employees who were sales representatives or responsible for handling returns.

As a result of [consumer reluctance to purchase products], SDTI's "selling cycles" were being stretched out as customers spent greater time and effort evaluating their own security requirements and stretched out their decision timetables in an effort to "wait and see" whether a particular security technology would emerge as the clear best or most prevalent. Moreover, as SDTI's Token business began to decline, the Company began to transition its sales force to selling an enterprise-based security product. Enterprise solutions, however, are sold completely differently than Tokens; they require intensive selling efforts with substantial engineering support and generally have an 18–month sales cycle. By contrast, SDTI's Token business has a 90–day selling cycle. Thus, SDTI's sales cycles were increasing for this additional reason.

*Id.* ¶ 34(d).

On November 14, 1997, SDTI filed with the SEC its Form 10–Q for the quarter ended September 30, 1997 ... which confirmed the previously announced financial results and was signed by defendant O'Leary. In a section of the Third Quarter 10–Q entitled "Certain Factors That May Affect Future Results," defendant repeated the boilerplate "risk disclosures" that appeared in the Prospectus. In the section of the Third Quarter 10–Q entitled "Notes to the Condensed Consolidated Financial Statements," defendants stated, in part, the following:

In the opinion of management, the accompanying unaudited condensed consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements, and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of the results of the interim periods presented.

**12.** Furthermore, the dismissal of Security Dynamics' patent counsel was clearly a business

decision.

This statement was materially false and misleading because it was not true that the Company's interim financial statements contained all adjustments necessary for a fair presentation of the Company's financial results as the Company was improperly recognizing revenues in connection with certain Token sales, as summarized in ¶ 34(b).

*Id.* ¶ 46. Additionally, on January 26, 1998, Security Dynamics issued a press release reporting revenues for the fourth quarter and year ended December 31, 1997, which Fitzer claims was materially false and misleading because it reflected inflated revenues. *See id.* ¶ 50.

The 1997 10–K also contained additional materially false and misleading statements which defendants knew were materially false and misleading, or which they recklessly disregarded. Among other things, for the reasons specified herein, the Company provided a materially false and misleading description of its pricing policies, neglecting to disclose that the Company regularly gave customers extended-life tokens and steep discounts for the sole purpose of making end-of-quarter sales so that the Company would appear to be achieving sustained growth, when in fact demand for tokens was not growing. In an effort to conceal the true adverse conditions affecting the Company, the Form 10–K stated, in part, the following:

> Subject to volume discounts and other licensing terms and conditions, the suggested U.S. list prices for the Company's products range as follows: SecurID tokens from $34 to $86 per token; ACE/Server software products from $3,950 to $553,000; RSA encryption engine and toolkit licenses from $25,000 to $50,000; and BoKS products from $52 to $275 per user for BoKS Desktop and from $1,250 to $3,100 per server for BoKS Manager. The Company continually reviews and adjusts its product pricing policies in

light of factors such as relative value, industry standards and demand.

*Id.* ¶ 54.

b. Analysis

There is support for Fitzer's argument that inflated or manipulated sales figures can give rise to a securities fraud cause of action. When a company floods the market with inventory, offers extraordinary discounts, or makes trade-in offers or extended payment terms at the end of a quarter in order to recognize the revenue on its books earlier, the practice is known as "channel stuffing." *See* Alan Schulman, *Preventing Fraudulent Financial Reporting, in* Financial Fraud in Public Companies: Prevention, Detection & Litigation 1999, at 579 (PLI Corp. Law & Practice Course Handbook Series No. 1115, 1999).

This Court has previously required significant specificity when a securities fraud claim is based on improper revenue recognition. *See Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 277 (D.Mass.1998). "To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." *Id.* (quoting *In re Oak Tech. Sec. Litig.,* No. 96–20552 SW, 1997 WL 448168, at *8 [N.D. Cal. July 1, 1997] ); *see also Gross,* 93 F.3d at 996 (dismissing allegations of revenue overstatement because plaintiff had not alleged the amount of the alleged overstatement or the net effect it had on the company's earnings); *In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1327 (N.D.Ga. 1998) (finding sufficient particularity when plaintiffs identified particular transactions); *Zeid v. Kimberley,* 973 F.Supp. 910, 923 (N.D.Cal.1997) (dismissing allegations of fraud based on defendant's liberal return policy because complaint did not set forth who had told the customers they

could return the products if not sold, when the transactions occurred, or whether any of the products ultimately were returned).

■ In the instant case, Fitzer has made general allegations relating to channel stuffing activity, but she has not supplied any of the details required to meet her pleading burden. At most, she provides an estimate that 5,000 to 10,000 card units were overshipped in each quarter, but she does not specify the customers involved (other than "large accounts") or whether those units were actually returned. Although she claims to have former employees as a source for her information, presumably those employees have not provided her with the transaction details necessary for the defendants to be put on proper notice as to the claims against them as required by Rule 9(b) and the PSLRA.

The First Circuit recently addressed the issue of channel stuffing in the context of a securities litigation case. *See Greebel,* 194 F.3d at 185. In *Greebel,* the court analyzed whether evidence of channel stuffing could give rise to a "strong" inference of scienter. The First Circuit's conclusion therefore applies directly to the second prong of the PSLRA pleading analysis, that of scienter.

In *Greebel,* the plaintiffs alleged that management knew that FTP Software's revenues during the Class Period would be low "and attempted to hide that fact by shifting income through channel stuffing (which remained undisclosed) and by artificially inflating income through improper revenue recognition." *Id.* at 202–03. The First Circuit ruled that channel stuffing evidence has some probative value, but that value is weak. "Unlike altering company documents, there may be any number of legitimate reasons for attempting to achieve sales earlier. Thus, it does not support a strong inference of scienter." *Id.* at 203.

As previously noted, however, this Court rules that the unusual stock sales of the four defendants Bidzos, Stuckey, Coviello, and Adams give rise to a strong inference of scienter. Allegations of channel stuffing do not, however, help Fitzer satisfy her burden of showing scienter as to the other defendants.

With regard to the adjustment of "selling cycles," due to customer indecision, *see* Am. Compl. ¶ 34(d), this Court sees nothing inappropriate in the adjustment of sales cycles in response to the nature of a product or the needs of customers. Nor did Security Dynamics make any particular statements with respect to selling cycles that could be considered fraudulent.

■ Fitzer has also not shown how the description of list prices provided by Security Dynamics in its 10–K Form could be fraudulent. *See id.* ¶ 54. It is widely known that list prices are often significantly higher than street prices. Furthermore, Fitzer has not plead any specific price information which would contradict the representations in the 10–K form. One specific allegation related to price, found in paragraph 34(a) of the Amended Complaint, notes a reduction in the price of Tokens from sixty-five dollars to forty-five dollars, which is legitimately in the thirty-four dollars to eighty-six dollars range described in the Form 10–K. Finally, the statement itself indicates that the prices are subject to volume discounts and other pricing policies, providing a warning to any investors using those prices as a proxy for future revenue calculations. The statement is non-actionable.

### 7. Statements Made by Analysts

Fitzer alleges that certain statements made by market analysts during the Class Period were materially misleading and were based on false and misleading information provided by Security Dynamics.

#### a. The Statements

Fitzer quotes a number of reports issued by market analysts which variously

described Security Dynamics using the following language:

> We recently visited with Security Dynamics' management team and were impressed with the Company's near-term product development strategy and long-term technology efforts... [T]his visit convinced us that the business trends remain strong and that the Company's long-term opportunities could yield impressive results ....
>
> ....
>
> From an execution standpoint, we are pleased that Security Dynamics has already delivered its first integrated product.

*Id.* ¶ 47.

> *Business continues to be strong, and management is confident about achieving 60% revenue growth.* The Company plans to roll out new products in [the second half of 1998], and we expect these will begin contributing to revenues and will stimulate customer sales.

*Id.* ¶ 49.

After the company's first release of negative information, one analyst commented, "Their new sales force is taking more time to get up to speed with its products." *Id.* ¶ 57. Another analyst wrote, "Damage should be temporary and confined to [the first quarter.] Business is strong and management is confident about achieving 60% growth revenue." *Id.* ¶ 58.

After another announcement of bad news on April 21, 1998, an analyst wrote, "It's a little worse than I initially expected." *Id.* ¶ 59. Another wrote, "[W]e believe Security Dynamics faces substantial challenges bringing together and marketing an enterprise solution that uses the capabilities of its different units...." *Id.*

### b. Analysis

▮ As this Court noted in *Number Nine* and *Peritus*, the majority of courts to address the analyst issue have adopted an "entanglement" test under which a company may be held liable if it has sufficiently entangled itself with the analyst who made the challenged statements. *See In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 55 (D.Mass.1998) (Lasker, J.) (discussing law of "several Courts of Appeals"). "Courts concluding that an issuer may be liable under the statute for failure to correct an analyst statement have generally required that the plaintiff allege that: (1) the issuer 'entangled' itself in the making of a statement by the analyst; (2) the issuer knew that the statement (commonly a prediction) was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors." *Id.*

The First Circuit has yet to rule on the issue of whether a company may be held liable for statements made in analysts' reports.[13] *See Suna,* 107 F.3d at 73. Assuming that the "entanglement" test does apply, the First Circuit has indicated that allegations of entanglement must satisfy the heightened pleading requirements of Rule 9(b). *See id.; see also Shiva,* 27 F.Supp.2d at 280 ("Even assuming ... that an analyst's statements could be attributed to a company, any allegation that the company made misrepresentations to the analyst must survive the Rule 9[b] standard."); *In re Boston Tech.,* 8 F.Supp.2d at 55 ("Applying the requirements of Rule 9[b] to the law [of 'entanglement'], a plaintiff is required to allege with particularity the time, place, content and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent.").

Moreover, although the First Circuit has yet to rule on whether a company may be held liable for statements made in analysts' reports, it has provided an example of the level of conduct that does not suffice to establish a prima facie case of liability.

---

**13.** Although the pleading issue was analyzed in the district court's opinion in *Greebel v. FTP Software, Inc.,* 182 F.R.D. 370, 374 (D.Mass.1998) (Tauro, C.J.), the First Circuit's affirming opinion did not discuss the issue of when liability could attach.

*See Suna*, 107 F.3d at 73. In *Suna*, the First Circuit held the following allegations insufficient to satisfy the heightened pleading requirements in a securities fraud case, which this Circuit has been "especially rigorous" in applying:

> [I]t was the Company's practice to have top managers, namely, Chief Financial Officer Heilman, communicate regularly with securities analysts ... to discuss, among other things, the Company's earnings prospects, its products, the efficiency of the Company's manufacturing plants, anticipated financial performance, and to provide detailed "guidance" to these analysts with respect to the Company's business, including projected revenues, earnings, and of particular importance to analysts, earnings per share.

*Id.*

Fitzer's Amended Complaint goes no further than the allegations in *Suna*. This Court thus holds that statements made by analysts during the Class Period are non-actionable.

### 8. Slow Release of Negative Information

Fitzer alleges that once negative information was released, Security Dynamics was slow to reveal the true extent of the problems, thus misleading the market into believing that the difficulties were temporary or less severe than they actually were.

#### a. The Statements

On April 2, 1998, SDTI announced that revenues for the first quarter of 1998 would fall short of the Company's operating plan. According to the press release, SDTI said it expected to report earnings for the first quarter of approximately $0.14 per share, compared to the $0.12 per share for the same period in 1997. However, these earnings must be compared to the $0.20 per share which analysts had projected and the Company endorsed. In response to this news, defendant Stuckey said that, "[a]s a result of the shortfall, we will need to perform further analysis to determine whether any adjustments to our business plan need to be made for the balance of 1998."

Am. Compl. ¶ 55.

On April 21, for the second time in almost as many weeks, the Company again shocked the market by issuing a press release published on *PR Newswire*, in which it announced that while it has reported first quarter results in line with its April 2, 1998, preannouncement, in fact, the Company was experiencing severe and material internal organizational and operational difficulties that would continue to adversely affect the Company for at least the next two quarters.

*Id.* ¶ 59.

On July 15, 1998, SDTI finally revealed the truth about its business and operations. On that date, the Company announced its financial results for the second quarter of 1998, the period ending June 30, 1998. The Company reported net income for the second quarter of only $10.7 million which included net non-recurring income of $7.8 million. While these meager results were in-line with analysts' revised expectations, the defendant Stuckey disclosed, for the first time, that, *in fact*, the Company was experiencing certain "market and technology transitional issues" which would continue to negatively affect its ability to grow in the future.

For the first time it was disclosed that the Company, *in fact*, was experiencing significant material adverse effects relating to the Company's purported integration of DynaSoft, among other acquisitions. For the first time, investors learned that SDTI *in fact* was unable to integrate DynaSoft into SDTI's operations or BoKS products into the Company's ESS framework. Additionally, investors learned for the first time that

SDTI *in fact* would be unable to resolve its integration problems in the near-term.

*Id.* ¶ 63.

b. Analysis

 Fitzer has not plead sufficient facts to show that these statements were false. Her sources, who are the former employees mentioned earlier, do not appear to this Court to have been in a position to know the overall financial situation of the corporation. Nor can they say when management received or learned of information on actual earnings such that it knew the second quarter results at the time they announced the first quarter results. Indeed, the second April press release followed less than three weeks later, indicating that Stuckey's undertaking to perform further analysis could have been honest and truthful. The results of that analysis were released in that second statement. The second statement indicated that the earnings pre-estimates in the first statement were actually accurate. The third statement was admittedly in line with analysts' revised expectations, though it added the information that the problems were long-term challenges. Common sense informs this Court that a corporation ordinarily may not be able to judge whether problems are long-term issues or short-term bumps in the road without waiting a quarter to track its own progress. The statements, on their face, indicate no more than that. Although Security Dynamics knew of an earnings slowdown by April 2, 1998, no unusual financial revisions were made to prior period statements, which might typically suggest a cover-up. The problems were not resolved by the time of the second quarter report, and it became evident to management that they were long-term problems. There is nothing

about this pattern of disclosures that indicates fraud. In the absence of additional particularized facts establishing a reason for why they were fraudulent, Fitzer cannot sustain her pleading burden of showing how those statements were misleading when made.[14]

## V. CONCLUSION

For the foregoing reasons, this Court concludes that Fitzer's Amended Complaint fails to state a claim for a violation of the securities laws. The defendants' motion to dismiss is GRANTED. (Docket 26.)

---

14. A declining demand of which management knows does not necessarily mean that management knows or ought know that a revenue slowdown is imminent. As may have happened in this case, gross revenue can increase even while the relative demand (or market share) for a product decreases. In the absence of particularized facts, this Court will not read into management's alleged knowledge of shifting product demands and price adjustments the knowledge of, and a fraudulent intent to conceal, long-term revenue shortfalls.