J. Robert ORTON, Mark E. Chorazy, Richard Burkhart, Sarunas Abraitis, and Roger E. Lawson, on behalf of themselves and others similarly situated, Plaintiffs,

v.

PARAMETRIC TECHNOLOGY COR-PORATION, Steven C. Walske, C. Richard Harrison, Noel G. Posternak, and Edwin J. Gillis, Defendants.

No. CIV.A.03–10290–WGY.

United States District Court, D. Massachusetts.

Nov. 3, 2004.

Aaron Brody, Jules Brody, Stull, Stull & Brody, New York, NY, for Charles Edward Johnson, Consolidated Plaintiff.

Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Daniel Helmick, Consolidated Plaintiff.

Ruth T. Dowling, Palmer & Dodge, LLP, Boston, MA, Henry B. Gutman, Simpson, Thacher & Bartlett, New York, NY, Kerry L. Konrad, Simpson, Thacher & Bartlett, New York, NY, Jason S. Stone, Simpson Thacher & Bartlett, New York, NY, for Parametric Technology Corporation, C. Richard Harrison, Edwin J. Gillis, Noel G. Posternak, Steven C. Walske, Defendants.

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Laura Mendelsohn, Walter Miller, Orton Group, Charles Edward Johnson, Consolidated Plaintiffs.

Theodore M. Hess–Mahan, Shapiro Haber & Urmy LLP, Boston, MA, for Market Street Securities, Inc., The Abraitis, Milton Kelman, Elliot Mayerhoff, Solomon Moskovits, Consolidated Plaintiffs.

Justin S. Kudler, Schatz & Nobel, P.C., Hartford, CT, for Milton Kelman, Plaintiff.

John C. Martland, Martland & Brooks LLP, Saugus, MA, for Bruce W. Holway, Plaintiff.

Jeffrey Nobel, Schatz & Nobel, P.C., Hartford, CT, for Milton Kelman, Plaintiff.

David Pastor, Gilman and Pastor, LLP, Saugus, MA, for Bruce W. Holway, Plaintiff.

David A. Rosenfeld, Geller Rudman, PLLC, Melville, NY, Samuel H. Rudman, Geller Rudman, PLLC, Melville, NY, for Laura Mendelsohn, Walter Miller, Plaintiffs.

Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP, New York, NY, Marc A. Topaz, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, for Laura Mendelsohn, Walter Miller, Plaintiffs.

Andrew M. Schatz, Schatz & Nobel, P.C., Hartford, CT, for Milton Kelman, Plaintiff.

Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, for Paradise Wire & Cable Defined Benefit Pension Plan dated 10/1/85, Edward Ogden, Vinesh Saxene, Consolidated Plaintiffs.

Joesph Weiss, Weiss & Yourman, New York, NY, for Charles Edward Johnson, Consolidated Plaintiff.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

This class action was brought by J. Robert Orton, Mark E. Chorazy, Richard Burkhart, Sarunas Abraitis, and Roger E. Lawson (collectively, the "Purchasers") against Parametric Technology Corporation ("Parametric") and Steven C. Walske, C. Richard Harrison, Noel G. Posternak, and Edwin J. Gillis (collectively, the "Individual Defendants") on behalf of purchasers of Parametric common stock between the class period of October 19, 1999 and December 31, 2002. The Purchasers seek remedies under the Securities Exchange Act of 1934 ("Exchange Act") for Defendants' allegedly false and misleading statements regarding Parametric's revenues and financial performance. Specifically, the Purchasers set forth claims for violations of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (Count I) and for violation of Section 20(a) of the Exchange Act (Count II). Defendants now move to dismiss the Consolidated Amended Class Action Complaint ("Complaint") with prejudice.

## A. Procedural Posture

Nine separate class actions brought against Defendants for material misstatements of Parametric's revenue and financial performance were consolidated under a single amended complaint on September 15, 2003. Consolidated Am. Class Action Compl. [Doc. No. 47] (hereinafter "Compl."). On March 5, 2004, Defendants filed a motion to dismiss the consolidated Complaint with prejudice. Defs. Mot. to Dismiss [Doc. No. 51]; *see also* Defs. Mem. in Supp. of Mot. to Dismiss [Doc. No. 52] (hereinafter "Defs. Mem."). The Purchasers opposed the motion, *see* Pls. Opp'n [Doc. No. 55], and Defendants filed a reply memorandum, *see* Defs. Reply [Doc. No. 54]. The Court heard oral arguments on the motion on April 28, 2004.

## B. Facts

The following recitation of facts is taken from the Purchasers' consolidated Complaint. This Court must take the facts alleged in the Purchasers' Complaint as true in considering Parametric's Motion to Dismiss.

### 1. The Parties

Lead Plaintiffs J. Robert Orton, Mark E. Chorazy, Richard Burkhart, Sarunas Abritis, and Roger E. Lawson allegedly purchased Parametric common stock at artificially inflated prices during the class period and have allegedly been damaged as a result. Compl. ¶ 22.

The Defendant Parametric, a Massachusetts corporation, develops, markets, and supports collaborative product development (CPD) software that helps manufacturers improve product development and competitiveness. *Id.* ¶¶ 2, 23. Parametric has two primary sources of revenue: software license revenue and service revenue

(which includes maintenance, consulting, and education revenue). *Id.* ¶ 2.

The Defendant Steven C. Walske ("Walske") served as Parametric's Chief Executive Officer until March 1, 2000 and as Chairman of the Board of Directors until June 2000. *Id.* ¶ 24(a). He signed Parametric's Report on Form 10–K for fiscal year 1999, filed on or about December 29, 1999. *Id.*

The Defendant Noel G. Posternak ("Posternak") has been a Director of Parametric since 1987, and has served as Chairman since June 2000. *Id.* ¶ 24(b). He serves as a member of the Board's Nominating and Corporate Governance Committee and Audit Committee. *Id.* The Audit Committee's primary function is to oversee financial compliance by reviewing financial information provided to stockholders and others, the systems of internal controls, and the audit process. *Id.* ¶ 141. Posternak signed all of Parametric's Reports on Form 10–K filed during the class period and Parametric's year 2000 Annual Report to shareholders. *Id.*

The Defendant C. Richard Harrison ("Harrison") has served as Parametric's Chief Executive Officer since March 1, 2000 and as President and a Director since 1994. *Id.* ¶ 24(c). He first joined Parametric in 1987 and has been credited with building Parametric's sales force. *Id.* ¶ 143. He signed all of Parametric's Reports on Form 10–K filed with the SEC during the class period, the Report on Form 10–Q filed with the SEC on or about August 13, 2002, and Parametric's year 2000 Annual Report distributed to shareholders. *Id.* ¶ 24(c).

The Defendant Edwin J. Gillis ("Gillis") was Parametric's Vice President, Chief Financial Officer, and Treasurer from the beginning of the class period until November 12, 2002. *Id.* ¶ 24(d). It was his responsibility as Treasurer to make proper accounts of the company's funds and to render statements of fund transactions and of the financial condition of the corporation. *Id.* He signed all of Parametric's Reports on Form 10–Q and 10–K filed with the SEC, and signed the 2000 Annual Report to shareholders. *Id.*

The Purchasers contend that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above." *Id.* ¶ 26. The Purchasers explain that the Individual Defendants "were aware, or recklessly disregarded," that Parametric's financial statements were false and misleading in contravention of federal securities laws:

> Each of the above officers of Parametric, by virtue of their high-level positions with the Company ..., directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition .... Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

*Id.*

### 2. The Allegations

The Purchasers allege that during the class period, Defendants issued statements

and filed reports with the SEC that were materially false and misleading because they misrepresented and/or failed to disclose the following facts:

(i) that since at least fiscal 1999, in violation of Generally Accepted Accounting Principles ("GAAP") and its own revenue recognition policies, the Company had cumulatively overstated its previously recognized maintenance revenue from its service contracts by approximately $33.4 million . . . ;

(ii) that Defendants knew or recklessly disregarded that Parametric was suffering from a chronic and systematic breakdown of its internal controls and procedures such that its financial reporting was inherently corrupted, subject to manipulation, and unreliable, resulting in the issuance of materially false and misleading financial statements; and

(iii) that as a result, the value of the Company's income and financial results were materially overstated at all relevant times.

*Id.* ¶ 3; *see also id.* ¶ 27(a)-(i) (summarizing the adverse facts that Defendants allegedly misrepresented and/or failed to disclose). At the close of the class period, Parametric admitted that it had identified "$20 to $25 million of previously recognized maintenance revenue which should have been deferred and recognized in fiscal 2003 and later periods," and that it needed to issue a restatement of its maintenance revenues. *Id.* ¶¶ 4, 16. (citing Press Release, dated 12/31/02). On January 14, 2003, Parametric announced that $33 million in maintenance revenue should have been deferred at September 30, 2002, to be recognized in fiscal 2003 and later periods, and that Parametric would have to restate its financials for the three previous fiscal years. *Id.* ¶ 4. On January 29, 2003, Parametric filed its 2002 10-K, containing its financial restatements for 1999, 2000,

and 2001, and identifying a total of $33,400,000 in maintenance revenue that should have been deferred and recognized in fiscal 2003 and later periods. *Id.*

The Purchasers allege that the Defendants, motivated by a drop in sales and an increase in expenses, improperly recognized revenue in earlier quarters "in order to inflate current results, thereby giving the market an unduly positive image of the Company's financial condition." *Id.* at ¶ 5. It is alleged that during the class period, Parametric failed to disclose in its SEC filings or press releases that its revenue figures were inaccurate. *Id.* The Purchasers allege that Defendants improperly recognized revenues in violation of GAAP by "(1) manipulating the recognition of software maintenance revenue; and (2) accelerating the recognition of revenue through 'channel stuffing.' " *Id.*

Both GAAP and Parametric's own revenue recognition policy require that revenue from software maintenance contracts is to be recognized ratably over the contract period. *Id.* ¶ 6. During the class period, Parametric treated some or all of software maintenance revenue as software license revenue, thereby recognizing it all at once rather than over time. *Id.*

Contrary to the typical practice of charging customers over time for a maintenance contract, Parametric would allegedly merge the cost of the software and maintenance contract, give the customer a discount, and charge the total amount up front. *Id.* ¶ 7. Parametric would then allegedly recognize all of the revenue at the time the contract was signed, rather than recognizing the maintenance portion of the contract price ratably. *Id.*

The Purchasers also allege that Parametric would purport to provide "free" maintenance programs to software purchasers, allocate the entire agreement as software license revenue, and then include the cost

of maintenance in the cost of the software license. *Id.* ¶ 8.

Defendants misallocated even more maintenance revenue, according to the Purchasers, through its "Pro/Ficiency Evaluator" product. *Id.* ¶ 9. The product is a Web-based training service for the employees of Parametric's software customers. *Id.* Parametric installed the program directly onto customers' servers and immediately recognized the revenue. *Id.* The Purchasers allege that the product is a service for which revenue should be recognized ratably. *Id.*

The Purchasers allege that the Defendants knew as early as June 2002 that the failure to allocate any portion of these sales agreements to maintenance revenue was ongoing and improper, as evidenced by a conference call in which Parametric sales representatives were informed that they would not receive commissions for some of the revenue they had recorded because it should not yet have been recognized. *Id.* ¶¶ 10, 109.

Parametric's financial statements during the class period, according to the Purchasers, were also materially false and misleading because they did not disclose Parametric's practice of "channel stuffing." *Id.* ¶ 11. "Channel stuffing is a deceptive business practice used by companies to artificially inflate sales and earnings figures," and can be accomplished by "offering dramatic discounts to clients to induce them to order more product than they can use in a period, shipping product to clients who have not ordered it, or simply shipping more product to a client than it has ordered." *Id.* Parametric is alleged to have directed resellers to place orders on behalf of their customers without their customers' consent, so as to immediately recognize revenue for sales that had not occurred. *Id.*

Finally, the Purchasers allege that the "Defendants were aware, or were reckless in remaining unaware, that in clear violation of GAAP, Parametric was suffering from a chronic and systematic breakdown of its internal controls and procedures." *Id.* ¶ 13. A source cited by the Purchasers describes how salespeople were unable to obtain Regional revenue accountings from the corporate headquarters, copies of actual invoices sent to customers, or notification when invoices were sent. *Id.* ¶ 14. This source was also never able to determine how the service portion of a sale was differentiated from the software license portion of a sale. *Id.*

After the close of trading on December 31, 2002, Parametric made its announcement that "$20 to $25 million of previously recognized maintenance revenue . . . should have been deferred and recognized in fiscal 2003 and later periods." *Id.* ¶ 16. Parametric also cut its fiscal first-quarter targets to a loss of $0.02 to $0.04 per share and reduced its revenue expectations from $180 million to $171—$175 million. *Id.* On the next day of trading, January 2, 2003, Parametric stock closed at $2.19 per share, down from the previous trading day's close at $2.52 per share. *Id.* ¶ 17. Volume on January 2, 2003 was 8,004,300 shares, as compared to the average volume of 1,449,370 shares for December 2002. *Id.* At least four analysts downgraded Parametric stock after the announcement. *Id.* ¶ 133. For example, Piper Jaffray of U.S. Bancorp downgraded Parametric stock on January 2, 2003 from "outperform" to "market perform" due in part to Parametric's aggressive recognition of maintenance revenue. *Id.* ¶ 91.

### 3. Allegedly False and Misleading Statements

The Purchasers have cited numerous statements made by Parametric and the

Individual Defendants during the class period and described them as false and misleading. *Id.* ¶¶ 28, 30, 33, 35, 37, 39, 41, 43, 46, 49, 51, 53, 55, 57, 59, 62, 64, 67, 69, 71, 73, 75, 78, 81, 85. For each statement, the Purchasers summarily identify the speaker, date, place, and reason why the statement is false or misleading. These will be discussed in more detail in section II.C. *infra.*

#### 4. Transaction and Loss Causation

As for transaction and loss causation, the Purchasers plead the following:

> At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.... Defendants made or caused to be made a series of materially false or misleading statements about Parametric's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Parametric and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

*Id.* ¶ 130 (internal citations omitted). In support of their causation pleading, the Purchasers point out that the stock price of Parametric fell on January 2, 2003, the first day of trading after Parametric's December 31, 2002 announcement that it had improperly recognized maintenance revenue. *Id.* ¶ 132. In addition, the Purchasers' also point out that at least four analysts downgraded Parametric stock after the announcement. *Id.* ¶ 133.

#### 5. The Defendants' Scienter

The Purchasers plead that

> [b]ecause of their Board Memberships and/or executive and managerial positions with Parametric, there is a strong inference that each of the Individual Defendants had access to the adverse non-public information about the Company's business operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents ..., conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

*Id.* ¶ 135 (internal citations omitted).

The Individual Defendants drafted, prepared and/or approved the reports and communications raised in the Complaint and, "[b]ecause of their Board membership and/or executive and managerial positions with Parametric, ... had access to the adverse undisclosed information about Parametric's financial condition and performance ... and knew (or recklessly disregarded) that these adverse facts rendered the *positive representations issued or adopted by the Company materially false and misleading.*" *Id.* ¶ 137. The Purchasers allege that the Individual Defendants had control over the content of the SEC filings, press releases, and other public statements made during the class period and had the ability or opportunity

to correct any false or misleading information contained therein. *Id.* ¶ 138.

The Purchasers further allege that the Individual Defendants were in a position to falsify public information about Parametric's financial condition that would affect the price of Parametric stock. *Id.* ¶ 139. According to the Complaint, Parametric's executive officers, including Gillis, Harrison, and Walske, "had a strong incentive to inflate Parametric's reported earnings because they were eligible to collect cash bonuses at the end of each fiscal year based on the achievement of certain financial targets, including earnings per share and revenue targets," and "because they benefit from stock-based awards [in the form of stock options] in the event of stock price appreciation." *Id.* ¶¶ 146–148. Posternak, as an outside Director and Chairman of the Board, had similar incentives because he received at least 50,000 stock options annually as part of his compensation plan. *Id.* ¶¶ 149–150. Likewise, Harrison and Gillis, as personal owners of Parametric stock, had incentives to inflate the price of the stock. *Id.* ¶ 151. Finally, the Purchasers allege that all of the Individual Defendants were motivated to inflate Parametric's reported revenues due to a drop in actual sales and an increase in expenses during the class period, which would have decreased the value of the Individual Defendants stock holdings and options. *Id.* ¶¶ 152–156.

### C. Federal Jurisdiction

The Court has federal subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337, and the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa. The Purchasers adequately have alleged that Parametric made use of the means and instrumentalities of interstate commerce in committing the acts of which they complain.

## II. DISCUSSION

### A. Standard of Review for Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded allegations in the nonmovant's complaint and must draw all reasonable inferences in favor of the nonmovant. *See, e.g., Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir.1999). Dismissal "is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery." *Id.*

### B. Relevant Legal Standards in Securities Context

To state a claim under Rule 10b–5, "a plaintiff must allege that: (1) in connection with the purchase or sale of securities, (2) the defendant made a false statement or omitted a material fact, (3) with the requisite scienter, and that (4) plaintiff relied on the statement or omission, (5) with resultant injury." *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 52 (D.Mass.1998) (Lasker, J.) (citing *Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996), and *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1216–17 (1st Cir.1996)). A misrepresentation or omission is material only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "[E]xaggerated, vague, or loosely optimistic statements about a company are not actionable under Rule 10b–5." *In re Boston Tech.,* 8 F.Supp.2d at 54 (citing *Gross,* 93 F.3d at 995).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting the fraud ... shall be stated with particularity." The First Circuit is "especially strict in demanding adherence to Rule 9(b) in the securities context." *Gross,* 93 F.3d at

991.[1] Thus, "the complaint must set forth specific facts that make it reasonable to believe that the defendant knew a statement was materially false or misleading. The rule requires that the particular times, dates, places, or other details of the alleged fraudulent involvement of the actors be alleged." *Id.; see also Fitzer v. Sec. Dynamics Tech., Inc.*, 119 F.Supp.2d 12, 18 (D.Mass.2000) ("To survive a motion to dismiss, a complaint alleging fraud must specify: (1) the statements that the plaintiff contends were fraudulent; (2) the identity of the speaker; (3) where and when the statements were made; (4) why the statements were fraudulent."). Allegations based on information and belief "must set forth the source of the information and the reasons for the belief." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991) (superseded by statute on other grounds).

 As for scienter, the plaintiff must plead "a mental state embracing [an] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The allegations contained in the complaint must create a "strong" inference of fraudulent intent. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196–97 (1st Cir. 1999) (holding that the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, codified at 15 U.S.C. § 78u–4, required a "strong" inference, rather than merely a "reasonable" one). Scienter can be proved by showing either knowledge that statements in issue were materially false or misleading, or recklessness in that regard, and the complaint must so plead. *See Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir.2001); *Greebel*, 194 F.3d at 198–201. Mere negligence does not meet

the "recklessness" standard. *Geffon*, 249 F.3d at 35–36. Rather, what is required is "a highly unreasonable omission [or statement], involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). In making the scienter determination, courts consider the totality of the circumstances, rather than examining each alleged omission or misstatement in isolation. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir.2002).

**C. Allegedly False and Misleading Statements**

The Purchasers have alleged that at least twenty-two statements made by Parametric and the Individual Defendants during the class period are false and misleading. Compl. ¶¶ 28, 30, 33, 35, 37, 39, 41, 43, 46, 49, 51, 53, 55, 57, 59, 62, 64, 67, 69, 71, 73, 75, 78, 81, 85.

**1. Corporate Puffery**

Parametric challenges eight of the allegedly false or misleading statements raised in the Complaint as "general expressions of corporate optimism of the type that courts in this Circuit have routinely held to be non-actionable 'corporate puffery.'" Defs. Mem. at 25.

 As the First Circuit has described, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely

1. *Gross* has been partially superceded on other grounds by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which is codified at 15 U.S.C. § 78u–4. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir. 1999).

optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Shaw*, 82 F.3d at 1217. The corporate puffery rule "covers loose optimism about both an issuer's current state of affairs and its future prospects." *In re Boston Tech.*, 8 F.Supp.2d at 54 (emphasis omitted).

■ Parametric's first challenge is to the underlined portion of a statement made by Defendant Harrison in a July 18, 2000 press release regarding Parametric's performance in the third quarter of fiscal 2000:

> We are encouraged by our performance this quarter. *Our results show that the actions taken to create separate business units within the company and to strengthen the product line focus of the sales organization are starting to have a positive impact.* We are committed to consistent profitability and to product leadership for both our traditional mechanical computer-aided engineering (MCAD) products and Windchill, our Internet-based collaborative product commerce (CPC) solution.

Compl. ¶ 39 (emphasis added). The Purchasers claim that this statement is false and misleading because it failed to disclose or misrepresented the fact that Parametric's financial results were not caused by Parametric's strategic decisions, but were the result of Parametric's improper recognition of revenue and breakdown of internal controls. *Id.* ¶ 40. This statement only skirts the border of corporate puffery. It is clear that Harrison was crediting the company's separation of business units and focus on product sales for Parametric's financial performance that quarter. Although Harrison may not have been puffing, his statement, nevertheless, is non-actionable because the Purchasers have not laid an adequate foundation for its falsity. The Purchasers make no factual allegations that Parametric's business strategies somehow impaired, or had no impact whatsoever, on the company's financial performance in the third quarter of fiscal 2000. This fact makes Harrison's statement different from a similar statement deemed actionable by this Court in *In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 331–32 (D.Mass.2002). In that case, the corporate defendant stated that its software product, Spectra, was "fueling growth." *Id.* at 331. This Court held that "[i]t is a precise statement as to the basis for profit growth which, if the assertions about Spectra's inability to operate are true ..., could not have been believed by its maker—at least not without recklessness on his part." *Id.* at 331–32. The Purchasers in the instant case, by contrast, have not alleged that Parametric's strategic business decisions were without any positive impact on their performance. This statement, therefore, is not actionable.

■ Parametric's second challenge is to a statement made by Defendant Harrison in a January 16, 2001 press release regarding the company's performance in the first quarter of fiscal 2001:

> We are pleased with the performance this quarter and the confirmation we are receiving from the market and our customers on the importance of product development as the core of competitive advantage.

Compl. ¶ 51. The Purchasers claim that this statement was false and misleading because it did not disclose that the company's financial performance was really a reflection of its improper recognition of revenue and the breakdown of internal controls. *Id.* ¶ 52. This Court holds that the statement steps over the line into the

realm of corporate puffery. That Parametric was "pleased with ... the confirmation [they] receiv[ed] from the market and [their] customers" is a subjective opinion that the Purchasers could not specifically prove or disprove. *See In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 220 (D.Mass.1999) (dismissing as corporate puffery a statement that "[w]e [at the company] are extremely proud of our success and our focus on near and long term opportunities in the software evolution market place"). Overall, it is difficult to imagine that this statement would be considered important by an individual investor or by the market as a whole.

■ Parametric's third challenge is to the underlined portion of another statement made by Harrison in an April 17, 2001 press release announcing Parametric's financial results for the second quarter of fiscal 2001:

> We are pleased with this quarter's financial results, especially in the face of difficult market conditions.... *Although we are not immune to the weakening economy in the near-term, we feel confident that the combination of our motivated workforce, solid infrastructure and total commitment to product development which is intended to deliver a high return on investment for customers, positions us for long-term growth* ....

Compl. ¶ 55 (emphasis added). The Purchasers claim that Harrison's comment that Parametric was "position[ed] ... for long-term growth" was false and misleading because it failed to disclose that long-term growth was unlikely because of Parametric's improper recognition of revenue in earlier periods and its breakdown of internal controls. *Id.* ¶ 56. This statement is a classic example of non-actionable corporate puffery. What company doesn't claim that its strong workforce, infrastructure, and product development position it

well for future growth? Harrison simply appears to be promoting Parametric in vague terms as a well-rounded company. This kind of general, "rosy affirmation" of Parametric's position for long-term growth cannot have been material to any reasonable analysis of the company's prospects. *See Colby v. Hologic, Inc.*, 817 F.Supp. 204, 210–11 (D.Mass.1993) (dismissing as immaterial a statement that "prospects for long term growth are bright").

Parametric's fourth challenge is to a similar statement made by Harrison in a July 17, 2001 press release announcing Parametric's financial results for the third quarter of fiscal 2001:

> I am confident that our strategy and products position us for leadership in the product development space, despite flat year over year revenues.

Compl. ¶ 59. The Purchasers again claim that Harrison's statement that Parametric was positioned for leadership in the future was false and misleading because it failed to disclose that long-term growth was unlikely because of Parametric's improper recognition of revenue in earlier periods and its breakdown of internal controls. *Id.* ¶ 60. For the same reasons discussed immediately above, this statement is nothing more than corporate puffery, and therefore non-actionable.

Parametric's fifth challenge is to the underlined portion of the following statement made by Harrison in an October 16, 2001 press release announcing Parametric's financial results for the fourth quarter and fiscal year 2001:

> *We executed well this quarter in an extremely challenging sales environment.* We believe that our strategic efforts in this past year in developing software solutions, expanding distribution and improving customer satisfaction are helping us to expand our leadership

position as the product development company.

Compl. ¶ 64 (emphasis added). The Purchasers characterize this statement as false or misleading because Parametric "did not achieve its results because it 'executed well,'" but rather because it improperly recognized revenue and was suffering a breakdown of internal controls. *Id.* ¶ 65. The Purchasers read too much into Harrison's comment. They have not alleged anywhere in the Complaint with any of the requisite specificity that Parametric had executed its software development, product distribution, or customer service poorly. Because the Purchasers have failed to allege any factual basis for their claim that these strategic decisions did not affect Parametric's financial results, this Court holds the statement non-actionable.

■ Parametric's sixth and seventh challenges are to two statements made by Harrison in a July 16, 2002 press release announcing the company's financial results for the third quarter of fiscal 2002:

> Despite a continued weak IT spending environment, we met the third quarter targets we set in April....
>
> Solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves.

Compl. ¶ 78 (paragraph structure altered). The Purchasers claim that the first statement is false because Parametric only met their targets by improperly recognizing revenue and allowing their internal controls to break down. *Id.* ¶ 79. The Purchasers further claim that the second statement is false and misleading because it failed to disclose that long-term growth was unlikely because of Parametric's improper recognition of revenue in earlier periods and its breakdown of internal controls. *Id.* ¶ 80. The Court rules the first statement actionable. In theory, the Purchasers could empirically disprove Harrison's statement by demonstrating that Parametric did not actually meet the financial targets set in April under GAAP and under the company's own accounting policies. The second statement, however, is not actionable. Expressing general optimism in Parametric's position for long-term growth is merely corporate puffery.

Finally, Parametric's eighth challenge is to the underlined statement made by Harrison in an October 15, 2002 press release regarding the company's fourth quarter of fiscal 2002:

> *In the face of continued economic weakness, we were able to achieve our targets this quarter due to solid execution of our key business initiatives ....* In the past year, we improved our distribution model and partner programs, drove higher levels of customer satisfaction and delivered superior, easy to use, interoperable solutions.

Compl. ¶ 85 (emphasis added). The Purchasers label this statement false and misleading because Parametric did not disclose that it "had only 'met' its targets by" improperly recognizing revenue and allowing its internal controls to break down. *Id.* ¶ 86. The Court holds that this statement is actionable. The Purchasers could prove the falsity of the statement by showing that Parametric did not actually meet its targets for the quarter under GAAP and under the company's own accounting policy. Parametric's ability to meet its financial targets is certainly material to any sensible evaluation of the company's performance.

To recap, the Court concludes that only two of the eight statements discussed in this section are actionable, and that the other six are dismissed for the reasons stated herein.

### 2. Forward-looking Statements

■ Parametric argues that five of the statements that the Purchasers allege were false and misleading are "forward-looking" statements accompanied by meaningful cautionary language, and thus protected by the "safe harbor" provisions of the PSLRA. Defs. Mem. at 25. In the alternative, Parametric argues that this Court should rule these allegedly forward-looking statements immaterial as matter of law. *Id.* at 26 n. 24; *see Carney v. Cambridge Tech. Partners, Inc.*, 135 F.Supp.2d 235, 245 (D.Mass.2001) (Lindsay, J.) ("[C]ourts in the First Circuit generally have declined to impose liability for so-called 'forward-looking statements' ... because these courts regard such statements as unlikely, as a matter of law, to be material to a reasonable investor.").

A forward-looking statement under the PSLRA is (1) "a statement containing a projection of revenues, income (including income loss), [or] earnings (including earning loss) per share," 15 U.S.C. § 78u–5(i)(1)(A); (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," *id.* at 5(i)(1)(B); or (3) "any statement of the assumptions underlying or relating to any statement" falling within the categories above, *id.* at 5(i)(1)(D).

Such a statement is protected from liability under Section 10(b) if, at the time it was made, it was "identified as a forward-looking statement, and [was] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements." 15 U.S.C. § 78u–5(c)(1)(A)(i).

That the five statements at issue here qualify as "forward-looking statements" does not appear to be in dispute.[2] *See* Pls. Opp'n at 20. The parties disagree, however, over whether the statements were accompanied by meaningful cautionary language. Parametric points out that four of the statements were contained in press releases that warned that some of the statements made therein "may constitute forward-looking statements that involve risks and uncertainties that could cause actual results to differ materially from those projected" and proceeded to list many of these risks. Defs. Mem. at 26. Parametric also contends that one of the challenged statements was contained in a 10–K report that contained cautionary language with respect to Parametric's future performance. *Id.* at 27. The Purchasers counter that these notes of caution were not really meaningful because "[n]othing in Defendants' supposed cautionary language advised investors that the Company was engaged in an accounting fraud and, there-

---

**2.** *See* Compl. ¶ 30 (stating in a 10–K filed Dec. 29, 1999 that "[w]e expect service revenue to continue to increase in absolute dollars in 2000"); *id.* ¶ 43 (stating in a Oct. 17, 2000 press release that "[t]hese are all positive signs for continued revenue and operational improvement in upcoming quarters"); *id.* ¶ 59 (stating in a July 17, 2001 press release that "[o]ur results this quarter reflect several factors.... We remain committed to our goals of profitability and growth, but the weakening manufacturing economy is likely to continue to impact our revenue.... Accordingly, the Company plans to reduce its existing cost structure, which will result in a charge against earnings in the fourth quarter"); *id.* ¶ 64 (stating in a press release dated Oct. 16, 2001 that "[a]s previously announced, PTC reduced its workforce and related facilities in the fourth quarter, in an effort to minimize the impact of the economic slowdown on our bottom line. These actions should improve operating margins in 2002 and result in year-over-year earnings growth"); *id.* ¶ 69 (stating in a Jan. 15, 2002 press release that "[o]ur first quarter is our seasonally weakest selling period and revenue should improve sequentially during the fiscal year").

304

fore, the statements are not protected by the PSLRA's safe harbor." Pls. Opp'n at 20.

■ To a certain degree, the Purchasers' position resonates with this Court. In this instance, the Purchasers allege conduct apart from the usual "risks and uncertainties" that come with predictions about future performance. Parametric and its principals allegedly *knew* that their forward-looking statements were untrue at the time they issued them. While this is an interesting point, the Court need not decide it. Even assuming that the forward-looking statements are not shielded by the PSLRA's safe harbor, it is unlikely, as matter of law, that such statements would be material to a reasonable investor or to the marketplace as a whole. Accordingly, the Court dismisses these five forward-looking statements as non-actionable.

### 3. Accounting Statements

The class period in this case begins on October 19, 1999, the date when Parametric issued a press release announcing its financial results for the fourth quarter and fiscal year 1999, and ends on December 31, 2002, the date when Parametric issued a press release announcing that it had identified "$20 to $25 million of previously recognized maintenance revenue which should have been deferred and recognized in fiscal 2003 and later periods." Compl. ¶¶ 1,4. On January 29, 2003, Parametric filed restated financial results with the SEC for 1999, 2000, and 2001, identifying a total of $33,400,000 in maintenance revenue that should have been deferred as of September 30, 2002 and recognized in later periods. *Id.* The Purchasers challenge as false and misleading numerous statements made in Parametric's press releases and SEC filings during the class period regarding Parametric's financial results for the three fiscal years that were eventually restated downward. Each of these statements was allegedly false or misleading due to Parametric's practice of improperly recognizing revenue. Specifically, the Purchasers claim that Parametric improperly treated all or a portion of software maintenance revenue as if it were software license revenue, thereby allowing for immediate, rather than ratable, recognition. *Id.* ¶ 6.

■ The primary evidence offered by the Purchasers in support of their allegations of improper revenue recognition is Parametric's own announcement and corrective restatement. Whether the accounting error was the result of a computer software glitch, as Parametric would have it, or a broader scheme devised by Parametric to misstate revenue in order to inflate the company's stock price, the pertinent issue at this point is whether the Purchasers' Complaint has sufficiently set forth *why* Parametric's public announcements and revised SEC filings for 1999, 2000, and 2001 were materially misleading. Although the "pleading with particularity" requirement of identifying a plaintiff's sources does not apply to the "underlying facts supporting the inference that the statement [complained of] was fraudulent," *In re Allaire Corp.,* 224 F.Supp.2d at 325 (citing *Fitzer,* 119 F.Supp.2d at 20–22), each of a plaintiff's allegations must have a sufficiently particular factual predicate. *See In re Peritus Software,* 52 F.Supp.2d at 222 n. 3. This Court has held that "[t]o adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." *Fitzer,* 119 F.Supp.2d at 35 (quoting *Lirette v. Shiva,* 27 F.Supp.2d

268, 277 (D.Mass.1998)) (internal citations omitted).

This standard demands significant specificity, and the Court is not entirely convinced that the Purchasers have met their pleading burden. The Purchasers' Complaint does not appear to break down the various factual allegations of improper revenue recognition to the level of detail contemplated by *Fitzer*.[3] Although the Court

seriously doubts the Purchasers have provided the detail required, it need not reach the issue at this point for reasons that will become clear in the next section.

## D. Scienter

■ For the actionable statements that remain, the Court must determine whether the Purchasers sufficiently plead the Defendants' scienter. For claims brought un-

---

**3.** The Purchasers's Complaint alleges that: (a) Parametric improperly "accelerated the recognition of revenue through 'channel stuffing,'" Compl. ¶ 5; (b) "it was a common practice at Parametric to merge the cost of the software and maintenance contract, give the customer a substantial discount, ... charge the customer the total amount up front ... [and] then fail to allocate any portion of the agreement to maintenance in order to accelerate revenue recognition," *id.* ¶ 7; (c) Parametric "instituted sales programs designed to allocate the entire agreement as software license revenue, such as providing 'free' maintenance programs to software purchasers, but including the costs of the maintenance in the cost of the software license," *id.* ¶ 8; (d) Parametric was improperly recognizing revenue immediately, rather then ratably, from sales of its "Pro/Ficiency Evaluator" product, a CD-based training service designed for customers' employees, *id.* ¶ 9; and (e) "Parametric was suffering from a chronic and systematic breakdown of its internal controls and procedures such that its financial reporting was inherently corrupted, subject to manipulation, and unreliable," *id.* ¶ 13. The Purchasers base their knowledge of these activities on several unnamed, former Parametric employees. *Id.*, App. A, at i.

Important facts underlying these allegations appear to be missing. First, stating that "channel-stuffing was 'rampant' at Parametric" and that a former direct sales representative "was personally aware of at least one [unsolicited] order for $75,000 worth of software by reseller Pentagon Engineering that was never delivered to the customer, Tracker Marine," Compl. ¶ 12, seems to fall short of the level of detail described in *Fitzer*. A similar allegation was dismissed by this Court in *In re Peritus Software*, 52 F.Supp.2d at 222 n. 3, for lack of a sufficiently particular factual predicate. *See id.* (holding that a complaint

"[s]tating that unspecified '[d]efendants ... back-dated several contracts signed in January 1998, including a contract with Zale Corporation,'" in support of an allegation that defendant "back-dated contracts in order to recognize revenue early," does not satisfy Rule 9(b)). Second, Purchasers do not provide the "who, when, where" for their claim that Parametric was merging software and maintenance contracts together and recognizing the total revenue at once, nor do they give even one example of such a contract. Third, the Complaint likewise seems to lack any detail underlying the alleged manipulation of revenue through "free" maintenance programs. Fourth, the Complaint appears to contain only vague support for its allegation that Parametric suffered from a breakdown of its internal controls. It states that a former national business development manager said "that when a salesperson would ask for a legitimate accounting of how the Company arrived at the revenue figure reported from her Region, no one at corporate headquarters was able to provide one," that it "was difficult, if not impossible, for a salesperson, or even a Regional Manager, to obtain copies of the actual invoices sent to customers," and that she "did not feel confident that corporate sales records were accurate." Compl. ¶ 14. While these comments loosely suggest that something unseemly was afoot in the corporate offices, they do not appear to provide the requisite factual detail of fraud. Finally, Parametric's sale of the "Pro/Ficiency Evaluator" CD does not seem to be the manipulative scheme that Purchasers make it out to be. On the basis of the information contained in the Complaint, this product looks more like an instruction program for software users than like an on-going service. The Complaint does not appear to allege any facts that would suggest that revenue from the CD could not be recognized immediately.

der section 10(b) of the Exchange Act and Rule 10(b)–5, a plaintiff must allege that the defendant acted with "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375. Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). Such facts may include the particular times, dates, places, or other details of the alleged fraudulent activity. *See Greebel*, 194 F.3d at 203–04. Although these particulars are not required *per se*, their absence from the complaint may be "indicative of the excessive generality of the[ ] allegations" supporting scienter. *Id.* at 204. Scienter can be proved by demonstrating that the defendant knowingly or recklessly issued a materially false or misleading statement. *Geffon*, 249 F.3d at 35–36; *Greebel*, 194 F.3d at 198–201. Going beyond mere negligence, a plaintiff must show that a defendant made "a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Greebel*, 194 F.3d at 198 (quoting *Sundstrand Corp.*, 553 F.2d at 1045).

To plead scienter, the Purchasers primarily rely on the following facts in their Complaint:

(1) *Violation of GAAP and Internal Corporate Policy:* Parametric's premature recognition of $33,400,000 in maintenance revenue for fiscal years 1999, 2000, and 2001 violated GAAP and Parametric's own accounting policy Compl. ¶ 4;

(2) *The Individual Defendants' Positions of Authority:* The Individual Defendants drafted, prepared, or approved the reports and communications raised in the Complaint and, "[b]ecause of their Board membership and/or executive and managerial positions with Parametric, ... had access to the adverse undisclosed information about Parametric's financial condition and performance ... and knew (or recklessly disregarded) that these adverse facts rendered the positive representations issued or adopted by the Company materially false and misleading," *id.* ¶ 137;

(3) *Motive:* The Individual Defendants stood to gain from an inflated stock price, *id.* ¶¶ 146–151, and were motivated to overstate Parametric's reported revenue because of a drop in actual sales and an increase in expenses during the class period, *id.* ¶¶ 152–156; and

(4) *Opportunity:* The Individual Defendants' had control over the content of the SEC filings, press releases, and other public statements made during the class period and were in a position to correct or falsify this information, *id.* ¶¶ 138, 139.

▮▮▮▮ A defendant's violation of GAAP is insufficient, by itself, to support a strong inference of scienter under the PSLRA. *See, e.g., Chill v. Gen'l Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996); *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627 (9th Cir.1994); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 362 (1st Cir.1994) (superseded by statute on other grounds); *In re Peritus Software*, 52 F.Supp.2d at 223. Similarly, the fact that a defendant voluntarily restates income does not, standing alone, support a strong inference of scienter. *See In re Peritus Software*, 52 F.Supp.2d at 224. Nor does a vague assertion that a defendant must have known about the fraud by virtue of his position of authority suffice to prove a strong inference of scienter. Finally, merely pleading motive and opportu-

nity is also insufficient, by itself, to establish scienter. *Greebel,* 194 F.3d at 197; *Fitzer,* 119 F.Supp.2d at 25 n. 7; *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 236 (D.Mass.1999).

Although none of the general allegations proffered by the Purchasers in their Complaint is determinative on its own, this Court may consider them together as indicative of fraudulent intent. In determining scienter, courts can look to the totality of the circumstances, rather than examining each alleged omission or misstatement in isolation. *See In re Cabletron,* 311 F.3d at 40. As this Court has previously described, "the Court's task becomes essentially that of a drama critic who must answer the following question: Have the [plaintiffs'] well-pled factual allegations *in their entirety* combined to form a narrative compelling enough to allow a 'strong inference' of intent on the part of the play's main actors? In other words, are the characters in the Complaint believable?" *In re Peritus Software,* 52 F.Supp.2d at 225.

 The narrative in this case, derived largely from interviews with unnamed former Parametric sales representatives and managers, is spotty and vague. The Purchasers charge Parametric with improperly recognizing $33,400,000 in maintenance revenues during the class period that should have been deferred and recognized in fiscal 2003 and later periods, as required under GAAP and under Parametric's internal policy. The Purchasers allege that Parametric engaged in "channel-stuffing"[4] and manipulated the structure of its products and sales contracts in order improperly to treat maintenance revenue as license revenue. In addition to the revenue restatement itself, the Purchasers' hinge their entire Complaint on the following facts:

(1) *Hiding Maintenance Revenue Through Contracts And Products:* "According to a former Parametric Channel Manager/Territory Sales Representative during the Class Period, Parametric also instituted sales programs designed to allocate the entire agreement as software license revenue, such as providing 'free' maintenance programs to software purchasers, but including the cost of the maintenance in the cost of the software license." Compl. ¶ 8. "[A]ccording to a former Parametric Director of Global Services Development throughout the Class Period, Parametric established a policy . . . to accelerate revenue with regard to its 'Pro/Ficiency Evaluator' product." *Id.* ¶ 9.

(2) *A Conference Call With Sales Team:* "In a conference call in June or July of 2002 involving the sales team of [Former Parametric Channel Manager/Territory Sales Representative], sales representatives were informed that they would not be receiving commissions for some of the revenue they had booked, because it should not yet have been recognized." *Id.* ¶ 10.

(3) *An Example Of Channel–Stuffing:* "According to a former Parametric Direct Sales Representative during the Class Period, channel-stuffing was

---

4. Courts in the First Circuit have suggested that evidence of channel stuffing, while probative, does not by itself support a "strong inference" of scienter. *See Greebel,* 194 F.3d at 202 (noting that there is "nothing inherently improper in pressing for sales to be made earlier than in the normal course"); *id.* at 203 (holding that channel stuffing does not support a "strong inference" of scienter because "there may be any number of legitimate reasons for attempting to achieve sales earlier"); *In re Focus Enhancements, Inc. Sec. Litig.,* 309 F.Supp.2d 134, 149–50 (D.Mass.2001) (Woodlock, J.); *Lirette,* 27 F.Supp.2d at 282–83.

'rampant' at Parametric .... [S]alespeople were routinely encouraged by Parametric management to contact resellers and inform them that a customer might be interested in placing an order. The reseller would then immediately place an order on that customers' behalf, without the customer actually having placed the order or given consent.... [The former Direct Sales Representative] was personally aware of at least one such order for $75,000 worth of software by reseller Pentagon Engineering that was never delivered to the customer, Tracker Marine." *Id.* ¶ 12.

(4) *An Unresponsive Corporate Headquarters:* "[Former Parametric National Business Development Manager] states that when a salesperson would ask for a legitimate accounting of how the Company arrived at the revenue figure reported for her Region, no one at corporate headquarters was able to provide one. It was difficult, if not impossible, for a salesperson, or even a Regional Manager, to obtain copies of the actual invoices sent to customers, and salespeople were not told when invoices were sent. This source did not feel confident that corporate sales records were accurate, and was never able to determine how the Company was accounting for the software license part of the sale, as opposed to the service portion." *Id.* ¶ 14.

These factual allegations lack the particularity required to establish a strong inference of fraudulent intent. *Who* instituted the "free" maintenance and Pro/Ficiency Evaluator schemes? *Which* customers received these contracts and products? *How much* maintenance revenue was masked as license revenue using these schemes? *Who* informed the sales team that they would not receive their full commissions? *Who* among Parametric management were encouraging channel-stuffing? *How much* revenue was misstated

due to channel-stuffing? *Who* among the Parametric sales representatives were encouraging premature orders from resellers? *Who* told reseller Pentagon Engineering to place the order for Trucker Marine? *When* did the transaction take place? *Was* the $75,000 even accounted for by Parametric as revenue? *Which* salespeople asked for an accounting from corporate headquarters? *When* was the request made? *Who* at corporate headquarters was unable to provide one? *Did* the individual(s) at corporate headquarters give a reason for not providing one? *Who* exactly tried to obtain copies of invoices? *When* were these attempts made? *How,* according to the source, were the corporate sales records inaccurate, and by *how much?* Although these four basic allegations are repeated throughout the Purchasers' Complaint, they are never rendered with any more detail than provided herein. Much of the elementary "who, what, where, when, how" is missing.

Overall, the Purchasers have only raised vague factual allegations regarding schemes and problems supposedly known to the Individual Defendants. The story patched together by the Purchasers does not contain the level of detail necessary to believe the fraudulent motives attributed to the Individual Defendants. Taking all of the Purchasers' allegations together, this Court holds that they do not permit a strong inference of scienter. Although a close call, the allegations set forth in the Complaint are too skeletal to make it believable that the Individual Defendants knowingly or recklessly misled investors.

## III. CONCLUSION

For the forgoing reasons, six statements contained in the Complaint are dismissed as non-actionable corporate puffery, *see* section II.C.(1) *supra,* five statements contained in the Complaint are dismissed as

non-actionable forward-looking statements, *see* section II.C.(2) *supra,* and the remaining statements contained in the complaint are dismissed due to the Purchasers' failure sufficiently to plead scienter, *see* section II.D. *supra.*

Accordingly, Defendants' Motion to Dismiss [Docket No. 51] is ALLOWED.

SO ORDERED.